The UNITED STATES,
Plaintiff–Appellee,

v.

Dr. George REUL, Defendant–Appellee,

and

St. Paul Fire and Marine Insurance Company, Defendant–Appellant.

No. 91–1264.

United States Court of Appeals,
Federal Circuit.

April 2, 1992.

Before NEWMAN, CLEVENGER and RADER, Circuit Judges.

CLEVENGER, Circuit Judge.

St. Paul Fire and Marine Insurance Company (St. Paul) appeals the final judgment of the United States Court of International Trade granting summary judgment in favor of the United States on its action to recover the principal amount of two Customs entry bonds, and prejudgment interest thereon, as to which St. Paul is surety for its principal, Dr. George Reul. *United States v. Reul*, No. 90–92, 1990 WL 133191 (Ct.Int'l Trade Sept. 12, 1990) (granting summary judgment); *United States v. Reul*, No. 91–6, 1991 WL 16497 (Ct.Int'l Trade Feb. 8, 1991) (denying rehearing).

The appeal raises two issues: whether the statute of limitations has run on the complaint filed by the United States, and if not, whether the Court of International Trade abused its discretion by awarding prejudgment interest against St. Paul from the date St. Paul's principal breached his contract with the United States. St. Paul does not appeal the judgment as to its liability for the principal amount of the bonds. We affirm the decision for the United States on the principal amount of the bonds, and vacate and remand for further proceedings regarding the assessment of prejudgment interest.

I

This case involves the importation of two Ferrari automotive vehicles by Dr. George Reul at the port of Houston, Texas. The first, a 1974 Berlinetta Boxer model (Car One), was imported June 14, 1977. The second, a 1977 model 512 (Car Two), was imported November 7, 1978. Both cars entered under an Immediate Delivery and Consumption Entry Bond (Single Entry), and each was subject to and required to meet existing emission standards promulgated by the Environmental Protection Agency (EPA) and federal motor vehicle safety standards promulgated by the Department of Transportation (DOT). *See* 19 C.F.R. § 12.73 (1977) and 19 C.F.R. § 12.80

Bruce N. Stratvert, Commercial Litigation Branch, Dept. of Justice, New York City, argued, for plaintiff-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office.

Leonard L. Rosenberg, Sandler, Travis & Rosenberg, P.A., Miami, Fla., argued, for defendant-appellant. With him on the brief was Barry M. Boren.

(1978). The regulations for emissions compliance stated in pertinent part:

(b) *Requirements for entry and release.* Each motor vehicle ... offered for importation or imported into the Customs territory of the United States shall be refused entry unless there is filed with the entry, ... a declaration ... which contains:

\* \* \* \* \* \*

(5) A statement that—

\* \* \* \* \* \*

(ii) Such 1971 or subsequent model year motor vehicle ... is covered by a certificate of conformity with Federal motor vehicle emission standards ..., or

\* \* \* \* \* \*

(x) Such motor vehicle ... is not covered by a certificate of conformity with Federal motor vehicle emission standards but will be brought into conformity with such standards and is being imported under bond in accordance with 40 C.F.R. 85.-203....

\* \* \* \* \* \*

(c) *Release under bond.* If a declaration filed in accordance with paragraph (b) of this section states that the entry is being made under circumstances described in paragraph [ (b)(5)(x) ] of this section, the entry shall be accepted only if the importer or consignee gives a bond ... for the production of a declaration that the vehicle is in conformity with Federal emission standards.... Within 90 days after such entry, or such additional period as the district director of Customs may allow for good cause shown, the importer or consignee shall deliver to the district director the prescribed declaration. If the declaration is not delivered to the district director ... within 90 days of the date of entry or such additional period as may be allowed ... the importer or consignee shall deliver or cause to be delivered to the district director of Customs those motor vehicles ... which were released in accordance with this paragraph. In the event that any such motor vehicle ... is not redelivered within 5 days following the date specified in the preceding sentence, liquidated damages shall be assessed in the full amount of the bond....

19 C.F.R. § 12.73 (1977).

With respect to motor vehicle safety, 19 C.F.R. § 12.80 required a similar declaration, bond, and redelivery process in order for imported vehicles to demonstrate conformance with federal motor vehicle safety standards. It thus was possible for persons such as Dr. Reul to import nonconforming automobiles by promising before entry to bring the vehicles into conformity within 90 days or such longer time as Customs might allow. Absent the requisite declarations of conformity, the importer agreed to forfeit either the vehicle or the principal of the bond.

Both of Dr. Reul's Ferrari vehicles were known not to conform with emission and safety standards when offered for entry. Dr. Reul consequently executed declarations that he would bring the vehicles into conformance. In addition to making the declaration, Dr. Reul posted bonds equal to the entry value of each vehicle, plus the estimated amount of duty and taxes, pursuant to 19 C.F.R. §§ 12.73(c), 12.80(c) and 113.14(g) (1978). St. Paul was surety on each bond. The bonds, as required by the above-cited regulations, specified that if a vehicle was not brought into conformance within the specified time period, the importer would redeliver it to Customs; failing timely redelivery, Customs would assess liquidated damages in the amount of the entire bond. When Dr. Reul made the required declarations and posted the appropriate bonds, Customs accepted the vehicles for entry under its informal entry procedures. 19 C.F.R. § 159.10(a)(1) (1978).

## II

Following importation on June 14, 1977, Dr. Reul delivered Car One to Monza Automobili (Monza) in Houston, which acted as agent and consignee for Dr. Reul. Its task was to perform the necessary modifications to bring the vehicle into compliance.

The history of Car One's compliance ordeal is written on the informal worksheet used by Customs as a control monitor. On the day after entry, Customs notified EPA and DOT of the entry and established an internal suspense date of October 6, 1977 for Car One. That suspense date constituted an extension of approximately three weeks beyond the 90–day period specified for compliance by the regulations. The record before us does not state a reason for the extension. Neither Reul nor St. Paul contends, however, that the extension was not for good cause shown.

The initial suspense date was the first of many extensions of time provided to enable Dr. Reul's agent to bring Car One into conformity with the applicable emissions and safety standards. Three days before the expiration of the initial suspension date, Monza sought an open-ended extension of time to achieve compliance. On October 25, 1977, Customs granted Monza a 90–day extension to January 6, 1978. Ninety days later, Monza had not performed the modifications necessary to obtain the declarations of conformity. EPA thereupon requested Customs to issue a Notice of Redelivery on Car One. Customs responded by issuing Form 4647, the Notice of Redelivery, on April 17, 1978, calling for redelivery of Car One on May 17, 1978.

Monza called Customs two days later to say that compliance forms had been submitted to DOT on April 11 and were in the process of transmission to EPA. Monza, also on April 19, 1978, sent Customs a letter which Monza stated it wrote on March 2, over a month before the Notice of Redelivery issued. In that letter, Monza requested another open-ended extension of the January 6, 1978 suspension date for Car One. Correspondence from Monza reflects additional requests for extensions of time made on April 24, July 31, and October 5, 1978. As a result of those communications from Monza, Customs extended the suspense date for Car One to June 26, 1978, and again to March 12, 1979. The last extension date resulted from EPA's intervention, which resulted from further pleas for extensions by Monza. EPA notified Monza in writing that, absent the appropriate declaration of conformity, Customs would issue a Notice of Redelivery for Car One on March 12, 1979.

When the declaration of emissions conformity was not produced, Customs issued a Form 4647 to Dr. Reul on March 20, requiring redelivery by April 20. Car One was not redelivered. Customs issued notice of liquidated damages to Dr. Reul on May 2, 1979.

The history of Car Two is less prolonged. The Customs worksheet indicates an initial internal suspense date of March 5, 1979, which constituted a 30–day extension of the 90–day period within which to produce declarations of conformity. Car Two was also delivered to Monza for work to bring it into conformance. A February 9, 1979 worksheet entry reflects that EPA sent Monza the same message for Car Two as had been sent on Car One: Customs would issue a Notice of Redelivery if it had not received a conformity statement by March 12, 1979. Customs received no such statement, and on March 19, 1979, a Form 4647 was issued to Dr. Reul for Car Two, requiring redelivery by April 19, 1979. The car was not redelivered, and Customs issued a notice of liquidated damages to Dr. Reul on May 2, 1979.

On August 17, 1984, Customs sent letters to Dr. Reul and St. Paul demanding payment of the liquidated damages, on the grounds that failure to redeliver the two vehicles constituted a breach of paragraph 4 of the bonds upon which St. Paul was surety. St. Paul filed mitigation petitions, which were denied by Customs on December 19, 1984. The government filed the present action April 17, 1985.

### III

■ We turn first to St. Paul's contention that the statute of limitations bars the suit to collect on the surety bonds. The applicable statute, 28 U.S.C. § 2415(a) (1988) requires that an action for money damages on a contract brought by the United States must be "filed within six years after the right of action accrues...."

St. Paul's argument, both before the Court of International Trade and on appeal, is that the right of action to collect on the two bonds accrued 96 days after liquidation of each entry, in each instance well more than six years before this suit was filed. St. Paul traces its accrual theory to the pertinent EPA and DOT regulations, 19 C.F.R. § 12.73 and 19 C.F.R. § 12.80. Each regulation plainly specifies that Dr. Reul enjoyed 90 days in which to obtain the requisite declarations of conformity, plus another five days, absent such declarations, to redeliver the non-conforming vehicles before he became liable for the full amount of the surety bonds on the 96th day after entry. St. Paul asserts that the United States was required to file its claim on the bonds within six years of the 96th day. St. Paul thus characterizes the cause of action as brought under the regulatory provisions for breach of their terms.

St. Paul's argument on this issue must fail for two reasons. It could not be more clear from the facts of this case that Customs granted extensions of the 90–day time requirement so that Dr. Reul's agents could bring the vehicles into conformity with emissions and safety standards. As to each vehicle, there was no "96th day" upon which the United States left itself free to file suit on the bonds.

The second reason relates to the complaint which was filed by the United States. The suit filed was for breach of paragraph 4 of the surety bonds. Paragraph 4 requires, among other things, that Dr. Reul, the principal in the bond:

> shall redeliver ... on demand [by Customs] ... any and all merchandise found not to comply ... or in default of redelivery after proper demand on him, the ... principal shall pay [Customs] ... liquidated damages.

On March 19, 1979 and March 20, 1979, pursuant to paragraph 4 of the bonds, Customs demanded redelivery of the vehicles by April 18 and 19, 1979. Those demands were not met; the default of redelivery constituted a breach of paragraph 4 of the bonds on April 18 and 19, 1979. A suit for the consequences of such default accrued on those dates. The complaint herein was filed within six years thereafter.

■ St. Paul raises two additional arguments to bar as untimely the action by the United States on the surety bonds. Each was unsuccessfully presented to the Court of International Trade on St. Paul's petition for rehearing. First, St. Paul contends that the finality of liquidation doctrine, as expressed in *United States v. Utex Int'l*, 857 F.2d 1408, 6 Fed.Cir. (T) 166 (1988) precludes any suit by the United States on the entries of Car One and Car Two. Second, if the United States can sue on the entries, St. Paul argues that the time for suit on Car One began to run 30 days after the first Notice of Redelivery which was issued on April 17, 1978. Were this argument to prevail, the cause of action with respect to Car One would be out of time.

### A

■ Simply stated, the finality of liquidation doctrine provides that all administrative decisions relating to an entry are final and conclusive on all persons, including the United States, unless timely protested. *See* 19 U.S.C. § 1514(a) (1988). In *Utex*, 115 cartons of frozen shrimp imported from India were released by Customs to Utex on the posting of an immediate delivery and consumption entry surety bond. Shortly thereafter, the Food and Drug Administration (FDA) issued a notice of detention regarding the shrimp, which were thought to contain Salmonella. The notice provided the importer with an opportunity to respond to the challenge to the imported foodstuffs. Notwithstanding that notice, which was intended to suspend importation proceedings, Customs liquidated the entry. No protest or reliquidation occurred. The entry was liquidated before FDA issued a Notice of Refusal of Admission, which required the importer to export the contaminated shrimp. When Utex failed to meet its obligation, Customs demanded liquidation damages from the surety. This court held that in such circumstances the liquidation of the entry barred any action on that entry other than timely action concerning protest or reliquidation. The prem-

ise of that decision was the fact that the importer's obligation to export the contaminated shrimp arose after Customs violated FDA's regulations by premature liquidation of the entry. *Utex*, 857 F.2d at 1412, 6 Fed.Cir. (T) at 171–72. That premise was recognized and emphasized by this court soon after in *United States v. Toshoku Am.*, 879 F.2d 815 (Fed.Cir.1989).

*Toshoku* also involved importation of allegedly contaminated foodstuffs. In that case, however, the FDA Notice of Refusal of Admission issued before liquidation occurred, thereby giving rise to obligations upon the importer that could not be extinguished by the subsequent liquidation. Citing *Utex*, this court noted the inapplicability of the finality of liquidation doctrine in those circumstances. *Id.* at 816 n. 3 ("obligations vested prior to liquidation are not comparable to post-liquidation obligations").

We agree with the Court of International Trade that *Utex* cannot be read to relieve Dr. Reul of the promises he made in order to allow his vehicles to enter and be liquidated. Unlike the situation in *Utex* where the FDA regulations required suspension of liquidation, the procedures used with respect to Dr. Reul's vehicles expressly permitted entry and liquidation of nonconforming vehicles. But the entry was subject to bond-backed promises either to bring the vehicles into conformance or to redeliver them within 90 days or such additional time as permitted by Customs. Dr. Reul's obligation to make good on his promises vested contemporaneously with and was made in order to enable entry of the vehicles. St. Paul, in briefing its rehearing motion, stated that "[w]e agree that the importer assumed certain obligations at the time of entry." Once so vested, we must conclude that those obligations were not erased by liquidation.

■ The finality of liquidation doctrine uses the event of liquidation, or any timely action concerning liquidation, to start the running of the statute of limitations. Where an importer has no post-liquidation obligation incurred before liquidation with attendant duties to perform concerning an entry, the doctrine may be applied. The doctrine, however, cannot be employed to release an importer from obligations vesting at or before liquidation. This suit by the United States is therefore not time-barred by the event of liquidation.

**B**

With respect to Car One, Customs issued a Notice of Redelivery on April 17, 1978, which specified redelivery by May 17, 1978. Since there was no redelivery on or before that date, St. Paul insists that under the United States' view of claim accrual, the statute of limitations began to run on that date.

St. Paul's argument was first presented in its petition for rehearing. In rejecting the contention, the Court of International Trade noted that it had "previously held Customs was permitted to and, at the request of the importer's agents, did grant the importer additional time in which to redeliver or show compliance." The Court of International Trade styled St. Paul's argument an "attempt to re-litigate" the facts. Those facts, according to the court, demonstrate a suspension of the effectiveness of the April 17 redelivery notice at the request of Dr. Reul's agent, and show a grant of additional time in order to achieve emission and safety conformance. Thus, the court held that the March 20, 1979 redelivery notice triggered the running of the statute of limitations. On the record before us, on this issue, there is ample evidence to support the decision of the Court of International Trade that the cause of action as to Car One is not time-barred by actions taken by Customs which permitted Dr. Reul and St. Paul to avoid liability with regard to the entry.

**IV**

■ Although no statute authorizes the award of prejudgment interest in this case, the Court of International Trade in exercising its equitable powers may in its sound discretion award prejudgment interest. *United States v. Imperial Food Imports*, 834 F.2d 1013, 1016, 6 Fed.Cir. (T) 37, 41

(1987). In this suit against both Dr. Reul and his surety, the United States requested prejudgment interest from the date of Dr. Reul's breach of paragraph 4 of the surety bonds, namely the 30th day following his failure to redeliver each vehicle. The Court of International Trade responded in full to the request, awarding prejudgment interest from April 20, 1979 at the rate set forth in 26 U.S.C. § 6621 (1988).

St. Paul offers three arguments against the legality of the award of prejudgment interest. The first goes to the question of whether *any* prejudgment interest can be awarded in this case. The other contentions grant that some prejudgment interest may properly be awarded, but challenge the amount entered.

■■■■ Prejudgment interest may not be awarded on punitive damages. *Underwater Devices v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1389, 219 USPQ 569, 576 (Fed. Cir.1983) (purpose of prejudgment interest to make party whole, not penalize). St. Paul contends that the liquidated damages called for by the surety bonds are punitive in nature. Consequently, no prejudgment interest may be awarded on the bonds. In this case the principal amounts of the bonds, the liquidated damages, were required by 19 C.F.R. §§ 12.80 and 113.14(g) to be equal to the value of the vehicles, as set forth in the entries, plus the estimated duties and taxes. This court has previously held that damages so computed, with respect to merchandise that an importer fails to bring into regulatory compliance to permit lawful entry, are not punitive. *Imperial Food Imports*, 834 F.2d at 1016, 6 Fed.Cir. (T) at 40. This precedent disposes of St. Paul's first argument against the award of prejudgment interest.

■■■ St. Paul's next two contentions question whether the Court of International Trade abused its discretion in the amount of the award of prejudgment interest.

The standard of review for a decision by a trial court in the award of prejudgment interest only permits us to "set aside [the decision] if it constitutes an abuse of discretion." *Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1485, 16 USPQ2d 1093, 1103 (Fed.Cir.1990) (quoting *General Motors v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211 (1983)). "Abuse of discretion may be established by showing that the district court either made an error of law, or a clear error of judgment, or made findings which were clearly erroneous." *Seattle Box Co. v. Indus. Crating and Packing*, 756 F.2d 1574, 1581, 225 USPQ 357, 363 (Fed.Cir.1985). Merely to say that we would have exercised the discretion differently provides no basis for reversal. *RCA Corp. v. Data Gen.*, 887 F.2d 1056, 1065, 12 USPQ2d 1449, 1457 (Fed.Cir.1989).

On its first contention, St. Paul argues that the abuse of discretion lies in a clear error of judgment by the Court of International Trade. That alleged error relates to the considerable slowness with which the United States pursued its monetary claim against Dr. Reul and St. Paul. It cannot be denied that demands upon Dr. Reul and St. Paul under the surety bonds were not made until August 17, 1984, seven years after the importations, and that the United States waited barely shy of six years to bring suit in 1985.

St. Paul refers us to the holdings of the Court of International Trade in *United States v. B.B.S. Elec. Int'l*, 622 F.Supp. 1089, 1095 (Ct.Int'l Trade 1985) and *United States v. Atkinson*, 575 F.Supp. 791, 795 (Ct.Int'l Trade 1983), in which the court awarded no prejudgment interest in circumstances where the United States was found to have been lax in initiating and prosecuting the actions. St. Paul also cites numerous customs cases in which prejudgment interest was awarded from periods well after demand on the surety, as a result of dilatory litigation practices. The problem for St. Paul with this line of argument is that Judge DiCarlo, on the petition for rehearing, recognized his authority to deny or limit prejudgment interest due to laxness on the part of the United States. He found, however, that "Customs did not unreasonably delay ... in bringing this action" *United States v. Reul*, No. 90–92, Slip op. at 6, and that "this case does not

involve 'laxness' on the part of the plaintiff." *United States v. Reul*, No. 91–6, Slip op. at 7. In support of those findings, the court referred to the multiple extensions of compliance or redelivery deadlines and the awareness of the importer as to the consequences of a breach of his obligations. The record also indicates that St. Paul, without demand upon it, may have been aware of the demands made upon Dr. Reul for liquidated damages on May 2, 1979. Furthermore, a certain amount of time was expended by both parties in pursuit of mitigation proceedings. Under *RCA*, 887 F.2d at 1065, 12 USPQ2d at 1457, we therefore must decline St. Paul's invitation to rebalance the equities, impose our view on the facts, and hold the court to have committed a clear error of judgment in not denying or limiting prejudgment interest because of alleged laxness by the United States.

■ Finally, we reach the issue of whether the court committed an error of law, and thereby abused its discretion, in deciding the amount of the prejudgment interest award entered in this case. This issue is framed by St. Paul's concession that award of prejudgment interest against a principal from the date of its breach can be appropriate, and its contention that the award of prejudgment interest from a date before demand upon the surety is unlawful.

The Court of International Trade is frequently called upon to exercise its discretion in ruling upon claims by the United States for prejudgment interest in customs cases. The parties in their briefs cite the apparent universe of such cases,* and with two exceptions they agree that prejudgment interest has never been awarded by the court from a date earlier than the date upon which demand was made on the surety for payment of the principal of the sure-ty bond. The exceptions are this case, and a case decided by Judge DiCarlo in its immediate wake, *United States v. Bealey*, No. 90–94, 1990 WL 138543 (Ct.Int'l Trade Sept. 17, 1990) (prejudgment interest awarded from seven days after redelivery demand).

We think it not surprising that this case and its sole progeny stand so markedly apart from all others on this issue. Whether one looks to the law of this circuit most recently expressed on the point, or to more ancient pronouncements from the Supreme Court, our sister circuits and state courts, one finds that the entire weight of authority holds that a surety cannot be taxed with interest on the principal's debt until demand is made upon the surety for payment of the principal's obligation.

To begin at the most recent authority, we look to this court's decision and holding in *Insurance Co. of North Am. v. United States*, 951 F.2d 1244 (Fed.Cir.1991), in which this court expressly held that "[a] surety owes interest from the time a creditor properly demands payment under a suretyship contract." *Id.* at 1247. That case arose from a surety bond given to assure the government that the principal, under a contract to remove timber, would fully perform its obligations. The court recognized that the surety's obligation to pay matures "[w]hen a contractor defaults under the contract[,]" *id.* at 1246 (quoting *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed.Cir.1985)), and noted that "[f]rom that time forward, the Government could properly demand payment of the bond." *Id.* at 1246. The court also cited and relied upon *United States v. United States Fidelity & Guar. Co.*, 236 U.S. 512, 35 S.Ct. 298, 59 L.Ed. 696 (1915), which fully informs the issue before us.

---

\* *United States v. Bealey*, No. 91–94 (Ct.Int'l Trade, Sept. 17, 1990); *United States v. Angelakos*, 688 F.Supp. 636 (Ct.Int'l Trade 1988); *United States v. Lun May Co.*, 680 F.Supp. 1573 (Ct.Int'l Trade 1988); *United States v. Monza Automobili*, 683 F.Supp. 818 (Ct.Int'l Trade 1988); *Wallace Berrie & Co. v. United States*, 12 CIT 103 (1988); *United States v. American Motorists Ins. Co.*, 680 F.Supp. 1569 (Ct.Int'l Trade 1987); *United States v. Continental Seafoods*, 672 F.Supp. 1481 (Ct. Int'l Trade 1987); *United States v. Imperial Food Imports*, 660 F.Supp. 958 (Ct.Int'l Trade), *aff'd*, 834 F.2d 1013 (Fed.Cir.1987); *United States v. B.B.S. Elec. Int'l*, 622 F.Supp. 1089 (Ct.Int'l Trade 1985); *United States v. Borge Int'l*, 9 CIT 484 (1985); *United States v. Atkinson*, 575 F.Supp. 791 (Ct.Int'l Trade 1983); *United States v. Goodman*, 572 F.Supp. 1284 (Ct.Int'l Trade 1983).

In *United States Fidelity*, the government sued a contractor and his surety for breaching a contract to construct a stone mess hall and kitchen at the Rice Station Indian School in Arizona. In the trial court, where the principal failed to appear and suffered a default judgment, the government sought from the surety the liquidated amount of the bond and interest from the date of the principal's breach, even though no demand for payment of the principal amount was ever made on the surety. The trial court entered judgment for the government on the principal amount of the bond, but denied the claim for interest. The surety prevailed on other grounds on appeal. The government, before the Supreme Court, renewed its claim to interest from the date of the principal's breach. In response, the Supreme Court phrased the issue:

> We merely consider, therefore, whether ... the United States is entitled, as against the surety, to interest upon [the principal amount] from the time of the principal's default, in the absence of notice of the default given to the surety, or any demand made upon it.

236 U.S. at 529–30, 35 S.Ct. at 303. Applying the rule followed by Mr. Justice Clifford in a case at the circuit, the Supreme Court noted that "we need go no further in order to overrule the contention raised by the Government at the trial of the present case:"

> Sureties, if answerable at all for interest beyond the amount of the [principal amount] of the bond ..., can only be held for such an amount as accrued from their own default in unjustly withholding payment after being notified of the default of the principal.

*Id.* at 530–31, 35 S.Ct. at 304 (quoting *United States v. Hills*, 4 Cliff. 618, 26 Fed.Cas. No. 15,369). The rule that interest cannot run against a surety absent notice and demand, where demand as in the instant surety contract is necessary to trigger the principal's obligation to pay, is commonplace elsewhere. In *Cunningham v. Cunningham*, 157 F.2d 859 (D.C.Cir.1946), involving suit against a surety for the behavior of an

allegedly incompetent fiduciary, the rule was so expressed:

> Nothing is due from the surety until he is notified of his principal's delinquency; if he then unjustly withholds payment, he is liable for interest because of his unjustifiable detention of the money. He is not required to take the initiative in making payment, and stands only as security until a claimant makes actual demand; then only does interest begin to accrue.

157 F.2d at 861 (*citing, inter alia, United States Fidelity & Guar. Co., supra*). See also *Jackson v. Glens Falls Indem. Co.*, 222 F.2d 807, 808 (D.C.Cir.1955). In the Ninth Circuit, the same conclusion had been earlier reached in a surety bond given to secure payment of a tax deficiency:

> [i]t is fundamental in the law of suretyship that a bondsman cannot be held for any default of his principal in an amount greater than the [principal amount] of the bond. Interest in excess of this amount may become due from the surety, but only upon the surety's own default, not the principal's. The surety is required to do nothing until the obligee has notified him of the default of the principal. If upon such notice the surety unjustly withholds the amount he has guaranteed, he is liable for interest ... because of his own unjust detention of money. This principle was laid down by the Supreme Court in *United States v. Fidelity Co.*, 236 U.S. 512, 530 [35 S.Ct. 298, 303]....

*Massachusetts Bonding & Ins. Co. v. United States*, 97 F.2d 879, 881 (9th Cir. 1938). In a similar tax deficiency case, the Fifth Circuit also followed the unmistakable directive from the Supreme Court. See *Maryland Casualty Co. v. United States*, 76 F.2d 626 (5th Cir.1935).

What is more, the Second Circuit in 1903 cited the "settled rule in the federal courts":

> [I]n general, interest, as against the surety, begins to run on the penalty, and on the debt if less than the penalty, only from the time of demand upon the surety, or notice to him to pay, or by suit, or

something equivalent to demand or notice.

*United States v. Quinn,* 122 F. 65, 66 (2d Cir.1903).

In a number of Miller Act cases, in which federal courts apply state law as to the liability of sureties for prejudgment interest, the same settled rule applies. "This means that interest can be charged against the surety only from the date of demand on it, because until then the surety is not in default." *American Auto Ins. Co. v. United States,* 269 F.2d 406, 412 (1st Cir. 1959) (applying Maine law). "[T]he prevailing rule requir[es] a demand for payment upon the surety in order to activate interest liability." *Golden West Constr. Co. v. United States,* 304 F.2d 753, 757 (10th Cir. 1962) (applying Utah law).

Whether the underlying issue pursued by the United States touches a timber removal contract, a mess hall-kitchen on an Indian reservation, the law of fiduciary duty, or tax collection, the rule, ancient and recent, is the same: no interest runs against a surety on the principal amount of a bond unless requisite notice and demand for payment is first made. Only then is the surety obligated to pay the United States; only from then can the United States lay claim to a loan to the surety. *See, e.g., Insurance Co. of North Am.,* 951 F.2d at 1247. In this case, the obligations of Dr. Reul and St. Paul under paragraph 4 of the bonds commence only upon demand for payment by the United States, not upon mere notice of alleged breach. On such a contract, the law prohibits prejudgment interest to run before the demand is made.

The entry of the award of prejudgment interest against St. Paul, because contrary to law, is an abuse of discretion. Whether prejudgment interest should run from demand upon St. Paul or some later date is a matter yet to be decided in the sound discretion of the Court of International Trade.

We affirm the judgment as to St. Paul's liability on the principal amount of the bond and vacate the award of prejudgment interest for reconsideration upon remand.

COSTS

No costs.

AFFIRMED–IN–PART, VACATED AND REMANDED–IN–PART.