MARRIOTT CORPORATION, Plaintiff–
Counter–Defendant–Appellee,

v.

DASTA CONSTRUCTION COMPANY,
Defendant–Counter–Claimant–
Appellant.

No. 92–2981.

United States Court of Appeals,
Eleventh Circuit.

July 22, 1994.

---

Herman M. Braude, Braude & Margulies, Roger C. Jones, Washington, DC, for appellant.

Mary Applegate Lau, Lau, Lane, Pieper, & Asti, Tampa, FL, for appellee.

Before TJOFLAT, Chief Judge, DUBINA, Circuit Judge, and PAINE *, Senior District Judge.

TJOFLAT, Chief Judge:

This case arises out of the construction of a Marriott Corporation hotel in Orlando, Florida. Marriott, the appellee, acted as both the owner and general manager of the project. In that capacity, Marriott contract-ed with Dasta Construction Company, the appellant, to perform certain portions of the work. After the hotel was built, Marriott brought this suit in the district court to recover payments it had made on Dasta's behalf to Dasta subcontractors and suppliers. Dasta counterclaimed, contending that Marriott not only had failed to carry out its contractual obligations, but also had interfered with Dasta's performance. A jury found for Marriott on its claims and awarded Marriott the sums it had paid Dasta subcontractors and suppliers. On the counterclaim, the jury found for Dasta and awarded it $4,659,390.90. The district court subsequently granted Marriott's motion for judgment notwithstanding the verdict, dismissing Dasta's counterclaim on the merits and limiting Marriott's award to its costs of action. Dasta now appeals, seeking reinstatement of the jury's verdict. Finding no merit in any of Dasta's arguments, we affirm.

I.

In early 1982, Marriott began construction on an elaborate resort complex, or "mega hotel," in Orlando, Florida.[1] The Marriott Orlando World Resort ("Resort") was to contain fourteen different building segments, including a twenty-eight story guest tower; numerous convention rooms, restaurants, and ballrooms; and several outbuildings for swimming pools, golf courses, and tennis courts. Due to the size and complexity of Marriott's undertaking—at the time of completion, the Resort was the largest building in terms of square footage in the state of Florida—construction was divided into several distinct projects requiring the coordination of numerous contractors and subcontractors.

Dasta became involved with the Resort in 1983, approximately one year after construction began. At that time, Dasta was one of the five largest building contractors in Kansas City, Missouri, specializing in all types of commercial and industrial construction and handling an average annual contract volume of between $20 and $30 million. Vincent

---

* Honorable James C. Paine, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Because we are reviewing the grant of judgment n.o.v., we consider the evidence, and state the facts in this part of the opinion, in the light most favorable to Dasta.

Dasta, the company's president and chairman of the board, possessed advanced degrees in civil engineering and business administration as well as more than twenty-five years of experience in the construction business.

Dasta first learned of the Marriott Resort project through William Hall, the owner of another Kansas City contracting company, Hall–Missouri. Although Dasta had never performed any work for Marriott,[2] Hall–Missouri had worked on three Marriott hotel construction projects and was familiar with Marriott's building practices.[3] Hall approached Dasta and suggested that the two contractors join forces to solicit work on the Resort. The combination was advantageous for both companies as Dasta possessed the size and experience to handle the large-scale Resort contracts, while Hall–Missouri offered a history of successful working relations with Marriott. In fact, it appeared doubtful that either company would have been capable of winning a contract for the Resort on its own.

On May 4, 1984, Marriott invited Dasta and Hall–Missouri to submit competitive bids for the exterior skin and drywall work on the Resort's guest tower. The majority of the exterior skin work consisted of affixing layers of stucco, plaster, and water-proofing onto the cement block walls of the guest tower. The drywall work consisted of the application of drywall boards and finishing materials to the guest tower's ceilings and inner walls. Case Concrete Contractors had already begun to construct the concrete walls that would provide the basis for the exterior skin at the time that Dasta and Hall–Missouri became involved in the Resort bidding process.

The bid invitation packages for the Resort's exterior skin and drywall projects each contained a set of architectural drawings, a set of plans and specifications, and a list of general conditions that defined the nature of the potential relationship between Marriott and Dasta. The drawings and specifications included in the Resort bids were only between 50 and 80 percent complete,[4] however, because the Resort was being built on a "fast track" basis. Under the fast track method, construction on a building begins before a final set of fully coordinated plans is completed. Rather, the architectural plans and specifications are designed and modified as the building's actual construction progresses. The advantage of the fast track method, as opposed to building from plans completed at the outset, is that it enables construction to begin at a much earlier stage in the project. The method's disadvantage results from increased difficulty in scheduling and coordinating the project since the construction progress schedule must be modified to account for constant plan changes. Notwithstanding these difficulties, however, Marriott had employed fast track construction in a number of prior, albeit smaller, hotel construction projects, including the three on which Hall–Missouri had been involved.

In May 1984, after reviewing the bid documents, Vincent Dasta and William Hall conducted pre-bid investigations of the project site in Orlando. During their visit, both men inspected the work in progress, reviewed the project paperwork, and engaged in "fairly lengthy discussion and specific discussion about the sequencing and scheduling of the work" to be done by Dasta. William Hall also participated in a critical series of special planning sessions hosted by Marriott. At these meetings, which lasted several days and which all of the contractors then working on the Resort attended, Marriott and the contractors engaged in detailed discussions about the current state of the Resort construction and the projected construction schedule. At the conclusion of these sessions, an outside planning consultant (who also attended the meetings) converted the

---

2. Dasta had submitted a bid for work on an earlier, unrelated Marriott project, but it did not secure the contract for that work.

3. Hall–Missouri performed drywall contracting work on a number of similar, albeit smaller, Marriott hotel construction projects in Virginia, Colorado, and Missouri.

4. Although the drawings were incomplete, they nonetheless indicated that they had been "issue[d] for construction." The drawings also indicated on their face when and how numerous revisions had been made.

information from the meetings into the Resort's Critical Path Method ("CPM").

According to the trial testimony of both Dasta and Marriott, a CPM is a standard construction device used to "plan the activities of a construction project in a logical orderly sequencing manner citing durations for the different activities from the beginning of the job to the end." A CPM is created by dividing the entire project into discrete and quantifiable steps; in turn, each step is allotted an estimated time for completion. Ultimately, each step is arranged into a chronological sequence, thus revealing the anticipated length and structure of the entire construction schedule. In addition to serving as a roadmap for the contractors to determine when and where their work fits into the overall construction sequence, the CPM also assists contractors in assessing their hiring and material purchasing needs.

On June 1, 1984, Dasta and Hall–Missouri (hereinafter referred to jointly as "Dasta") submitted bids under the Dasta moniker for both the exterior skin and drywall contracts. Dasta priced the exterior skin contract on enough "manpower to accomplish that work on an eight-hour day 40–hour basis and be done on time," and submitted the successful low bid price. Dasta was awarded that contract, but failed to win the drywall contract.

Shortly after submitting its bids, Dasta received a copy of the CPM developed at the planning meetings. The CPM essentially restated the scheduling information that Dasta had received during the site visit; Dasta anticipated that the exterior skin work would commence in mid-July 1984 and continue in a logical fashion for fifteen months before concluding in September 1985. The CPM also stated that it was "for [Dasta's] use in scheduling and determining crew sizes and work areas as per General Conditions of the Specifications item 6A [and 6]C, page 5." [5]

According to Vincent Dasta, the company concluded that the CPM "was a good schedule and adequate to accomplish the exterior skin work in an efficient, production-type manner, working normal hours with optimum crew sizes." On July 2, 1984, Dasta formally contracted with Marriott to perform the exterior skin work for a lump sum price of $3,109,850. All of the documents from the original bid package—including the drawings, specifications, and general conditions—were incorporated into the final contract.

In mid-July, Dasta's construction team arrived at the project site and learned that construction was operating at least five months behind schedule. The delay was caused by the "extremely poor quality" of Case's concrete work, which contributed to a concrete collapse in the Resort's tower area in mid-May. The defective concrete work was of particular concern to Dasta since much of its exterior skin work had to be placed directly onto Case's concrete work, such that any problems with the concrete would translate directly into problems with the exterior skin. Although Dasta had planned "to be working full force" immediately upon arrival at the construction site, the defective concrete prevented it from doing so. Dasta related these concerns to Marriott, which in turn assured Dasta that Case was going to fix the defective work and that Dasta should not worry because Dasta was "not going to be responsible for [any other contractor's problems]."

5. The relevant portion of the referenced General Conditions provided as follows:
 6. Progress Schedule
 A. The Contractor agrees to comply with the progress schedule established by the Owner, or any revision thereof, and agrees that the Work shall be prosecuted regularly, diligently and uninterrupted, within the time specified. Owner specifically reserves the right to modify the progress schedule as required by the conditions of work.

 . . . . . .

 C. Should the Contractor fail to comply with the progress schedule or, in the Owner's opinion, otherwise fail, refuse or neglect to supply sufficient labor and/or material in the prosecution of the Work, Owner shall have the right to (1) direct Contractor to furnish such additional labor and/or material as may, in the Owner's opinion, be required to comply with the progress schedule or otherwise diligently prosecute the Work. . . . Any costs incurred by Owner pursuant to the exercise of its rights under this paragraph shall be borne by the Contractor and shall not increase the Contract Sum.

In addition to the faulty concrete, Dasta experienced a number of other difficulties and delays during the prosecution of its contractual obligations. First, Marriott's fast track approach resulted in frequent and significant modifications to both the architectural plans and the progress schedule. These modifications prevented Dasta from proceeding in the orderly sequence that was anticipated by the original CPM, thereby causing Dasta to incur significant additional costs due to inefficiency and under-utilized labor. In total, Marriott issued hundreds of changes to the Resort's drawings and progress schedule.[6]

Second, Marriott's failure to provide adequate vertical transportation and safety measures placed Dasta further behind schedule. Naturally, Dasta's performance on the upper tower areas depended upon its ability to get men and materials up to its work areas. Dasta's efforts were hampered, however, by a shortage of elevators and hoists and by Marriott's use of the lifts. When Dasta offered to bring its own hoist onto the construction site to increase efficiency, Marriott refused to allow it. Dasta experienced similar delays due to Marriott's belated erection of a safety net required by Occupational Safety and Health Act standards (to catch debris falling from work being done on the tower's upper levels). Although the original progress schedule anticipated that Dasta would begin the tower work upon its arrival in July, Dasta was unable to begin until January 1985, when Marriott finally put up the net.

Despite these indications that performance of its contractual obligations might be more difficult than it originally believed, Dasta gradually undertook greater responsibility on the Resort project. In October 1984, after Case repeatedly failed to correct its faulty concrete work, Marriott and Dasta agreed that Dasta would perform the repairs. Dasta submitted unit prices for the repair work, and Dasta and Marriott drafted a written "Change of Contract" order to encompass the additional work. The procedure for handling the change of contract was provided for in the General Conditions of the original exterior skin contract.[7] Dasta also accepted other work assignments from Marriott that were unrelated to Dasta's base contract work and that resulted in more than twenty separate Changes of Contract, increasing Dasta's total compensation by $3,255,591.75.

Moreover, in January 1985, roughly six months after Dasta began working at the Resort, Dasta submitted another competitive bid for the Resort's non-tower drywall contract. Again, Dasta priced its bid on a logical and orderly "production-type manner, working normal hours;" on January 15, Marriott awarded the contract to Dasta for a

---

6. The changes to the plans and the progress schedule originated from two sources. First, many of the changes were issued directly by the full-time architectural and engineering staff that Marriott employed on the job site. Second, additional changes were based on input cultivated from daily reports and weekly progress meetings that were attended by each Resort contractor.

7. The provision provided, in relevant part, as follows:

> 17. CHANGES IN WORK
>
> A. The Owner ... may order changes in the work within the general scope of the contract consisting of additions, deletions or other revisions, the contract sum being adjusted as applicable. All such changes in the work shall be authorized by a change of contract....
>
> B. A Change of Contract is a written order to the Contractor signed by the Owner ..., issued after the execution of the contract, authorizing a change in the work or an adjustment of the contract sum or the time of performance....

> C. In making any change, the charge or credit for the change of contract will be determined as follows:
>
> > A request for a proposal shall be issued in writing to the Contractor by the owner. The Contractor shall, within 7 working days of the receipt of such request, submit a proposal for the requested change to the Owner. The proposal shall contain a quantity survey including quantity calculations, area calculations, unit prices, labor hours, rates and any other information necessary to provide the owner, in the Owner's opinion, with a comprehensive understanding of the proposal....
>
> If the contractor believed that Marriott was requiring it to perform extra work without a change order, the contract permitted the contractor to initiate a change order, provided that the contractor submit its proposed change order to Marriott "within seven (7) days [of Marriott's order for the extra work], complete with detailed labor and material costs."

lump sum price of $1,749,050. Although the drywall contract was a separate contract, its terms and conditions were identical to the exterior skin contract, and both parties treated the two contracts as one at all times.[8]

On January 23, 1985, one week after Dasta entered into the drywall contract, Marriott hosted a second CPM session. At the meeting, Marriott proposed advancing the Resort completion date by three months, to April 1, 1986. Each contractor was represented at the meeting (including William Hall for Dasta) and each contractor agreed to the acceleration.[9] As a result, the new CPM was immediately put into effect, and Dasta continued to perform its contract work.

It eventually became clear, however, that Dasta was not up to the task. In February 1986, as the Resort's completion date drew near, cost overruns resulting from the delays in the Resort progress schedule caused Dasta to run out of money. As a consequence, Dasta could no longer compensate its subcontractors and suppliers. Vincent Dasta met with Marriott on February 3 to discuss "the additional costs Dasta was incurring due to disruption, acceleration, overtime work, increased crew sizes, etc." At that time, Marriott told Mr. Dasta that the important thing was to get the Resort completed in time and that afterwards Marriott would discuss a fair and reasonable settlement. According to Dasta, Marriott instructed Dasta to submit a formal "efficiency claim"[10] for its additional costs. Dasta relied on Marriott's assurances and borrowed more than $1.5 million in order to meet its contractual obligations.

Notwithstanding the additional borrowed funds, Dasta remained unable to pay all of its suppliers and subcontractors; accordingly, Marriott made several payments on behalf of Dasta. On February 28, 1986, under Dasta's direction, Marriott paid $292,000 directly to Dasta's subcontractors and suppliers and subtracted an equal amount from the outstanding balance due Dasta on the contracts. Furthermore, on September 24, 1986, after Dasta had left the work site and the Resort was opened to the public, Marriott was forced to make additional payments to Dasta subcontractors and suppliers in order to discharge certain liens that they had recorded against the Resort. The suppliers and subcontractors filed the liens because Dasta had neglected to pay them for services rendered at the Resort.

At approximately the same time, Dasta presented the efficiency claim that Marriott had invited it to submit at the February 3 meeting. Dasta sought several million dollars as compensation for the additional costs it incurred in performing the contract work.[11]

8. Dasta suffered delays on the drywall contract similar to those it experienced on the exterior skin contract. Although the drywall work could be prosecuted only under "water tight and temperature controlled" conditions, such conditions were not in place until several months after Dasta was originally scheduled to begin the drywall work.

9. At trial, Vincent Dasta denied that everyone at the meeting agreed to the acceleration. Vincent Dasta, however, did not attend the meeting; accordingly, his testimony on this point lacked probative value and was simply self-serving hearsay. Those who attended the meeting and testified at the trial denied the existence of any opposition to the acceleration.

10. Marriott denies that it instructed Dasta to submit a claim for its additional costs. Because we are reviewing the propriety of the district court's entry of judgment n.o.v., we disregard Marriott's denial and accept, as true, Dasta's version of the events. In the proceedings below, and on appeal, Dasta labeled its claim for the additional costs it incurred on account of delay as an "efficiency claim." As discussed in the text *infra*, this claim includes the costs associated with condensing Dasta's time of performance, e.g., increased costs due to additional manpower and overtime pay. In this opinion, when we discuss Dasta's efficiency claim, we refer to this formulation of the claim.

11. A letter written by the outside consultant that Dasta hired to prepare its efficiency claim, included in Dasta's claim to Marriott, stated as follows:

Our analysis shows that Dasta experienced disruptions, interferences, etc. on the [Resort] project. The compensable damages in this regard are as follows:

| | | |
|---|---|---:|
| 1. | Labor Inefficiencies | $ 1,069,168.44 |
| 2. | Extended Equipment Costs | $ 60,032.15 |
| 3. | Outstanding Change Orders | $ 377,787.60 |
| 4. | Extended Jobsite Overhead | $ 85,069.14 |
| 5. | Extended Home Office Overhead | $ 79,996.45 |
| 6. | Interest on Borrowed Monies | $ 268,796.00 |
| 7. | Legal/Accounting Expenses | $ 210,460.00 |
| | TOTAL AMOUNT | $ 2,151,309.78 |

## II.

Rather than negotiate or pay Dasta's claim, Marriott filed this suit in the United States District Court for the Middle District of Florida. In its complaint, Marriott sought, first, indemnification from Dasta for the sums it had paid to satisfy the mechanics' liens filed against the Resort by Dasta subcontractors and suppliers, and, second, a declaration that it was not liable for the amount of Dasta's efficiency claim.

On November 4, 1986, Dasta answered Marriott's complaint and filed a counterclaim for $3,933,502.20. In these pleadings, Dasta advanced several theories of law to support its position that it owed Marriott nothing for the sums Marriott had purportedly paid on Dasta's behalf and that it was entitled to recover the damages sought. Among other things, Dasta alleged that (1) at the time Dasta bid the contracts, Marriott misrepresented both the progress of the overall construction and the terms and conditions of Dasta's undertaking, misrepresentations that induced Dasta substantially to underbid the job; and (2) Marriott breached the contracts by unduly delaying Dasta's performance.[12] At the pre-trial conference, the district court reduced Dasta's numerous theories of recovery to a claim for breach of contract.

The case was tried to a jury. After eight days of trial, the jury found, by special verdict, that Marriott was entitled to recover the $369,402.02 it had paid Dasta suppliers and subcontractors and that Dasta was entitled to recover $2,452,311.00, the unpaid balance due on the contracts, and $2,207,079.90, the damages Dasta suffered by reason of Marriott's deliberate interference with Dasta's performance of the contracts, along with accumulated interest.

Marriott thereafter moved for either judgment n.o.v.[13] or, in the alternative, a new trial. The court gave Marriott judgment, set aside the jury's verdict for Dasta, and awarded Marriott the sum of $369,402.02. In an opinion accompanying its ruling, the court observed that there was no evidence that Marriott had committed the contractual breaches Dasta had alleged or that Marriott had interfered, in violation of its contractual duty to the contrary, with Dasta's performance of the contract work.

## III.

■ Dasta asks us to reinstate the jury's verdict and to direct the district court to enter judgment in conformance therewith, or, alternatively, to order a new trial. According to Dasta, the district court properly submitted its breach of contract claim to the jury; the court erred, however, when it held, on motion for judgment n.o.v., that the contract documents precluded Dasta's recovery. Whether the contracts precluded Dasta's claims for the additional and unanticipated expenses it incurred in performing the work is a pure question of law, to be answered by examining the language of the contracts themselves.[14] *Zaklama v. Mount Sinai*

---

12. Dasta's counterclaim contained nine counts. Reduced to their essentials, these counts claimed, collectively, that Dasta was entitled to recover money damages from Marriott for the unnecessary and unanticipated expenses it incurred in prosecuting its work because Marriott fraudulently, or, in the alternative, negligently, misrepresented the condition and status of the Resort project; Marriott's plans and specifications, which it "impliedly warranted," were inaccurate; Marriott negligently supervised the work; and Marriott made oral assurances to Dasta (thus modifying the terms of the written contracts), while the work was in progress, that it would reimburse Dasta for such expenses when the project was completed. Finally, Dasta claimed, in the alternative, that Marriott was liable to it for the additional expenses Dasta incurred under the theory of *quantum meruit*.

13. At trial, Marriott moved for a directed verdict at the close of all the evidence. The district court withheld its ruling on the motion pending the return of the jury's verdict.

14. There is no claim in this case that we must look beyond the contract documents to determine the rights and obligations of the parties.

*Medical Ctr.*, 906 F.2d 650, 652 (11th Cir. 1990). Whether Marriott fraudulently or negligently misrepresented the progress of the overall construction of the Resort or the terms and conditions of Dasta's undertaking, however, are questions of fact, to be answered by examining the evidence adduced at trial in the light most favorable to Dasta. *See, e.g., Norton v. Snapper Power Equip.*, 806 F.2d 1545, 1548 (11th Cir.1987).

Our analysis of the contract documents in this case leads us to the inescapable conclusion that Dasta has no claim, under those documents, for the injuries it purportedly suffered at the hands of Marriott. Our analysis of the evidence leads us to the identical conclusion: Dasta has no claim under any of the theories of recovery it advances.

### A.

■ The Resort, although not an unique undertaking for Marriott, represented one of Marriott's largest and most ambitious construction projects. Inherent in the scale and complexity of the project was the potential for delay in the various phases of its construction. This potential was enhanced by Marriott's use of the fast track construction method, such that construction began with neither a final set of plans and specifications nor a firm progress schedule or completion date. Presumably, contractors involved with the Resort project made provision for the risks presented by such contingencies in two ways: first, by setting their bid prices high enough to absorb the "additional costs" they might incur in performing the work (including the costs Dasta seeks to recover in this case); and, second, by negotiating contract terms and conditions designed to minimize such costs. In the present case, the parties thoroughly addressed and allocated the risks of delay inherent in the Resort project.

In the General Condition entitled PROGRESS SCHEDULE, which the parties incorporated into their contracts, Marriott "specifically reserve[d] the right to modify the progress schedule as required by conditions of the work," while Dasta, for its part, "agree[d] to comply with the progress schedule established by the Owner, or any revision thereof." General Condition 6A.[15] Further, General Condition 6C provided that:

[s]hould the Contractor fail to comply with the progress schedule, or in the Owner's opinion, otherwise fail, refuse or neglect to supply a sufficient amount of labor or material in the prosecution of the Work, Owner shall have the right to (1) direct Contractor to furnish such additional labor and/or materials as may, in the Owner's opinion, be required to comply with the progress schedule or otherwise diligently prosecute the work, or (2) furnish such additional labor and/or materials as may be required to comply with said schedule. *Any costs incurred by Owner pursuant to the exercise of its rights under this paragraph shall be borne by the Contractor and shall not increase the Contract Sum.*

(Emphasis added.) In addition to the foregoing, Article III, section 3.1 of both the exterior skin and the drywall contracts, entitled TIME OF COMMENCEMENT AND COMPLETION, reiterated Marriott's right to modify the progress schedule:

TIME IS OF THE ESSENCE OF THIS AGREEMENT. The Owner may sustain financial loss if the project or any part thereof is delayed because the Contractor fails to perform any part of the work in accordance with the contract documents, including, without limitation, a failure to comply with the schedule for this project, *or any revision thereof, established by Owner.* The Contractor shall begin the work at the time directed by the Owner

---

Nor is it contended that one or more contract provisions are ambiguous and thus subject to parol evidence to discern the parties' intent. Our analysis therefore is limited solely to an examination of the contract documents.

**15.** *See, supra* note 5. As stated earlier, the general conditions were part of the exterior skin bid package, such that Dasta was aware of these conditions prior to submitting its exterior skin bid price. Moreover, in the Critical Path Method that Dasta received after submitting its exterior skin bid, but before formally contracting to perform the work, Marriott specifically cautioned Dasta that the use of the CPM "in scheduling and determining crew sizes and work areas" was expressly subject to the "General Conditions of the Specifications item 6A, 6B, 6C, page 5."

and perform its obligations under this agreement with diligence and sufficient manpower to maintain the progress of the work as scheduled by Owner, without delaying other contractors or areas of work. At the request of the Owner, *the Contractor shall perform certain parts of the work before other parts, add extra manpower, or order overtime labor in order to comply with the schedule (or any revision thereof), all without any increase in the contract sum.*

(Emphasis added.) Finally, in Article III, section 3.2, Dasta certified that "the required materials and manpower [would be] available to prosecute the work in accordance with such schedule." In short, Marriott had complete discretion to adjust the schedule as well as to demand that Dasta comply with such adjustments without additionally compensating Dasta.

In arriving at its bid prices, Dasta had the opportunity to account for Marriott's broad powers, as well as to compensate itself for the risk of delay, by increasing its prices fairly to reflect the risks it was assuming. Article V, section 5.2, addressing the Contract Sum, specifically advised Dasta that its price should include "all increases in costs, foreseen or unforeseen, including ... labor and materials" and that "[a]ll loss or damage arising from any of the work through unforeseen or unusual obstructions, difficulties or delays which may be encountered in prosecution of the work, or through the action of the

elements shall be borne by Contractor." Under this pricing arrangement, known as lump sum pricing, Dasta bore the risks associated with underestimating its price or failing to account for unexpected additional costs.[16] At the same time, however, Dasta would reap all of the benefits of any cost savings, in the event that the Resort was completed at an earlier date, or in a more efficient manner, than originally anticipated.

Dasta was familiar with this form of contract pricing. Dasta was also aware of both the potential for delay in this project and the fact that it would not be entitled to demand additional compensation for delay from Marriott upon completion. Despite this knowledge, Dasta priced its contracts under the unrealistic expectation that there would be no modifications to the progress schedule and that the work would be prosecuted, according to Vincent Dasta, "in an efficient production-type manner, working normal hours with optimum crew sizes."

■ Notwithstanding that Dasta, in formulating its bid prices, failed to protect itself from the delays occasioned here, it still protected itself, in the contracts, against unforeseen delays beyond its control, including those caused by the "act or neglect" of Marriott or Marriott's subcontractors or from "changes ordered in the scope of the work." A provision in the contracts, known as a "no damage for delay" clause, gave Dasta the specific right to seek an extension of its time for performance in the event of delay; Dasta,

---

**16.** Dasta argues that it was not aware of the risks associated with the Resort project because Marriott·fraudulently and negligently misrepresented or concealed material aspects of the Resort construction. According to Dasta, Marriott misrepresented the fact that the Resort was a fast track project by issuing plans that stated they were "issue[d] for construction," when in actuality they were old and incomplete. Additionally, Dasta cites Marriott's failure to reveal that Case's concrete work was severely deficient and several months behind. Had Marriott revealed these facts, Dasta argues, it would have accounted for them by increasing its bid price.

Dasta's argument is unavailing. There is no indication in the record that Marriott restricted Dasta's freedom to investigate the Resort project or that Marriott failed to reveal any information that it was obligated to disclose to Dasta. After Dasta received the documents containing the alleged misrepresentations, Dasta conducted a

thorough on-site investigation of the project and engaged in lengthy discussions with both Marriott personnel and other contractors already working on the Resort. Dasta also attended the CPM meetings at which the Resort's progress schedule was developed. Finally, the uncontradicted evidence at trial indicated that William Hall was aware that Marriott employed the fast track method in its hotel construction projects. Accordingly, Dasta's claims of fraud and misrepresentation have no basis in fact.

In a related argument, Dasta claims that it is entitled to recover its damages under a theory of implied warranty based on Marriott's misrepresentations that the Resort plans and specifications were complete and issued for construction. This claim likewise finds no support in the record, is plainly inconsistent with Dasta's awareness that Marriott employed a fast track mode of hotel construction, and is therefore rejected.

as consideration for this right, agreed not to seek damages for such delay. The no damage for delay clause, located in General Condition Item 7A, states as follows:

> If the Contractor is delayed at any time in the progress of the Work by any act or neglect of Owner or by any contractor employed by Owner, or by changes ordered in the scope of the Work, or by fire, adverse weather conditions not reasonably anticipated, or any other causes beyond the control of the Contractor, then the required completion date or duration set forth in the progress schedule shall be extended by the amount of time that the Contractor shall have been delayed thereby. However, to the fullest extent permitted by law, Owner and Marriott Corporation and their agents and employees shall not be held responsible for any loss or damage sustained by Contractor, or additional costs incurred by Contractor, through delay caused by Owner or Marriott Corporation, or their agents or employees, or any other Contractor or Subcontractor, or by abnormal weather conditions, or by any other cause, and Contractor agrees that the sole right and remedy therefor shall be an extension of time.[17]

In order to receive an extension of time, however, Dasta was obliged to present Marriott with a legitimate request for an extension of time.[18] In addition to the no damage for delay clause located in General Condition Item 7A, the contracts between Marriott and Dasta contained an independent clause, General Condition Item 7B, that required Dasta to submit a written request detailing the cause and length of the delay, as well as the length of the requested extension.[19] The condition also required that the request be submitted within seven days of the commencement of the delay.

The utility of a written request, or its functional equivalent, is that it would have provided Marriott with a meaningful opportunity to evaluate the legitimacy of Dasta's claim, and to determine whether Dasta's request should be honored or rejected. This notice requirement was particularly important because Dasta was only entitled to recover damages if Marriott's refusal to grant a time extension was wrongful. *See Pertun,* 918 F.2d at 919–20 (refusing to enforce no damage for delay clause where owner prevented request for extension by wrongful and premature termination of contract).

Finally, assuming *arguendo,* that Dasta made a legitimate request for an extension of time, as required under the contracts in this case, and that Marriott subsequently refused to grant the extension, Florida law would not permit the no damage for delay clause to bar Dasta's recovery if the delays were occasioned by Marriott's fraud, concealment, or active interference with Das-

---

**17.** Under Florida law, no damage for delay clauses are valid, enforceable, and not in violation of public policy. *Southern Gulf Util., Inc. v. Boca Ciega Sanitary Dist.,* 238 So.2d 458, 459 (Fla. 2d Dist.Ct.App.1970); *C.A. Davis, Inc. v. City of Miami,* 400 So.2d 536 (Fla. 3d Dist.Ct. App.1981). *See also United States f/u/b/o Pertun Constr. Co. v. Harvesters Group, Inc.,* 918 F.2d 915, 919 (11th Cir.1990); *United States f/u/b/o Seminole Sheet Metal Co. v. SCI, Inc.,* 828 F.2d 671, 675 (11th Cir.1987) (*"Seminole"*).

**18.** Although Dasta argues, based on this Court's holding in *Pertun,* that Marriott was obligated to issue Dasta an extension of time even in the absence of a request by Dasta, we disagree, finding that *Pertun* is plainly distinguishable on its facts. In *Pertun,* the requirement of a written demand for an extension was obviated by the fact that the Owner terminated the contract before the contractor had the opportunity to make the request. Additionally, the no damage for delay clause in *Pertun,* unlike the one here, did not

expressly condition the grant of a time extension upon the submission of a written request. Rather, the clause in *Pertun* simply stated that in the event of delay, the "time fixed for completion ... shall be extended" for the appropriate time. *Id.* at 919 (emphasis added). As such, *Pertun* cannot be relied on for the proposition cited by Dasta here.

**19.** General Condition 7B states as follows:

> Any claim for extension of time shall be made in writing by the Contractor to Owner, for approval by Owner, within seven (7) days after commencement of the delay. Contractor's failure to give such written notice to Owner shall deprive the Contractor of his right to claim an extension of time and any damages or additional costs incurred by Contractor resulting from such delay. In the case of a continuing cause of delay, only one claim shall be necessary. The giving of such notice shall not of itself establish the validity of the cause of delay or of the extension of time for completion.

ta's performance under the contract. *Seminole*, 828 F.2d at 675; *see also Southern Gulf*, 238 So.2d at 459 (no damage for delay clause ineffective where delay is knowing and sufficiently egregious); *McIntire v. Green–Tree Communities, Inc.*, 318 So.2d 197, 199–200 (Fla. 2d Dist.Ct.App.1975) (delay clause ineffective where "circumstances which caused the delay were brought about by [owner] and were even foreseen but concealed by [owner] when the contract was made"). These exceptions to the no damage for delay clause are premised upon an "implied promise and obligation not to hinder or impede performance." *Newberry Square Dev. Corp. v. Southern Landmark, Inc.*, 578 So.2d 750, 752 (Fla. 1st Dist.Ct.App.1991).

▉ Thus, under the terms of the contracts, Marriott had absolute authority to modify the construction schedule, while Dasta was obligated to abide by Marriott's instructions. Although these terms may seem one-sided, Dasta was aware of these provisions at the time it bid the contracts, and had the opportunity to increase its proposed contract prices to account for the risks it would be assuming. Dasta failed to seize upon this opportunity, and, in hindsight, made a pair of improvident bargains from which we are powerless to grant relief. It is not the function of the courts to "rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the

parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain." *Steiner v. Physicians Protective Trust Fund*, 388 So.2d 1064, 1066 (Fla. 3d Dist.Ct.App.1980) (quoting *Beach Resort Hotel Corp. v. Wieder*, 79 So.2d 659, 663 (Fla.1955)).

### B.

▉ It is unnecessary to determine whether Marriott actively interfered with Dasta's performance, because Dasta waived the application of the no damage for delay clause by failing to make a proper request for an extension of time as required by the contracts.[20] At trial, Vincent Dasta testified, on direct examination, as follows:

Q: Now Mr. Dasta, at any time in the course of this job did you personally submit a written request to Marriott for an extension of time?

A: No, only verbal.

Q: To your knowledge, did Bill Hall [Dasta's project executive] or Ed Matthews [Dasta's project manager] submit a written request for an extension of time?

A: They may have. I don't have direct knowledge of it.

Q: Do you recall ever seeing [a] written request for an extension of time?

---

**20.** Relying upon a series of Florida cases holding that no damage for delay clauses "do[ ] not preclude recovery for delays resulting from a party's fraud, concealment, or active interference with performance under the contract," *post*, at 1072, the dissent would hold that Marriott's active interference invalidated the entire contract provision governing delays, including the provision requiring Dasta to request an extension of time for delay. It is true that, despite the no damage for delay clause in the contract, Dasta would be able to recover damages under Florida law if Marriott deliberately interfered with Dasta's performance. *See e.g., Seminole*, 828 F.2d at 675; *C.A. Davis*, 400 So.2d at 538; *McIntire*, 318 So.2d at 199–200. The delay provision in this case, however, provided for more than just immunity from money damages. Rather, in addition to the no damage for delay clause contained in General Condition Item 7A, the delay provision in this case, unlike those in each of the Florida cases relied upon by the dissent, conditioned remedies for delay upon Dasta's first mak-

ing a legitimate request for an extension of time. *See* General Condition 7B.

Thus, it is our view, as explained *infra*, that Dasta is not entitled to recover for its delay damages because it failed to comply with the independent notice requirement, not because the clause exempting Marriott from money damages is enforceable. The dissent failed to account for the additional clause, which required Dasta to submit a prompt and detailed written request for an extension of time before Marriott's delay-inducing conduct would become actionable.

Moreover, as a practical matter, the dissent's approach is untenable because it would frustrate the bargained-for agreement of the parties. Rather than encouraging Dasta to mitigate its damages by providing Marriott with the early opportunity to address the problems alleged by Dasta, the dissent's approach would have encouraged Dasta to remain silent about the delays and sue at a later time—an effect that clearly was never intended by the parties.

A: I may have recalled seeing one, yes, but I can't tell you when I saw it or when it was written. But, I may have.

Obviously, this testimony was insufficient to demonstrate that Dasta presented Marriott with a written request for an extension of time.[21] Moreover, none of Dasta's verbal communications to Marriott was sufficient to constitute the functional equivalent of a written request for an extension of time. Vincent Dasta testified that he and other Dasta employees "made numerous verbal comments, notices, however you want to call them or portray them" that Dasta was being delayed by the conditions of the job. The exchanges referred to by Dasta, however, amounted to little more than grumblings and complaints by Dasta that were met with generalized assurances from Marriott that Dasta would not be held responsible for any delays. In these exchanges, Dasta did not identify, with any degree of particularity, the cause or the length of any of its alleged delays. As such, these comments and notices by Dasta were legally insufficient to activate the protection of the no damage for delay clause.[22]

Dasta argues that it never requested an extension because Marriott had indicated that "no extensions of time were to be given on this job." Despite the knowledge that Marriott had adopted a position that was wrongful under the conduct, Dasta failed to take any affirmative steps toward enforcing its legitimate contractual right to request an extension. Instead, Dasta decided to accept Marriott's generalized statements because, according to Vincent Dasta, it "relied on another portion of the contract which specifically states that there is a trust and confidence relationship between parties and that ... both parties have to have mutual trust and confidence in each other."

We are not persuaded by Dasta's explanation.[23] In the face of a clear contractual provision directly addressing its right to relief in the given situation,[24] Dasta, in light of its sophistication and experience, simply was not permitted to rely on general notions of good faith and mutual fair dealing. Moreover, there is no indication that Marriott's actions were wrongful or in bad faith. Although Dasta might have been entitled to an extension of time if it was in fact delayed by Marriott's actions, Marriott had a contractual right to engage in the course of conduct it pursued. Despite Dasta's complaints to the contrary, the exercise of a legitimate contrac-

21. In presenting its evidence at trial, Dasta introduced no document that could have served as such a request.

22. Dasta, in a separate theory of recovery, asserts that the generalized assurances that it received from Marriott constituted oral modifications to the written contracts. For two reasons, we reject Dasta's claim. Initially, the statements upon which Dasta relies were legally insufficient to create a binding agreement either by oral modification of a written contract or by estoppel. *Cf. Professional Ins. Corp. v. Cahill*, 90 So.2d 916, 918 (Fla.1956) (refusing to permit oral modification of a written contract except where an oral agreement has been "accepted and acted upon by the parties in such manner as would work a fraud on either party to refuse to enforce it"); *W.R. Grace & Co. v. Geodata Services, Inc.*, 547 So.2d 919, 925 (Fla.1989) (quoting *Geodata Services, Inc. v. W.R. Grace & Co.*, 526 So.2d 922, 930 (Fla. 2d Dist.Ct.App.1988) (Campbell, J., dissenting)) (rejecting estoppel argument because "mere expectations based upon oral representations regarding future rights of parties to a contract specific in its written terms [is] insufficient to support a cause of action") (citations omitted). Second, even if Marriott's statements were sufficient to modify the contracts, Dasta's claim nonetheless would fail for want of consideration. *See City of Miami Beach v. Fryd Constr. Corp.*, 264 So.2d 13, 15 (Fla. 3d Dist.Ct.App.1972).

23. We are similarly unpersuaded by Dasta's claim that, in light of Marriott's unequivocal statements refusing to grant any extension, Dasta was released from its duty to request a time extension as a matter of law because such an act would have been futile. *Compare Craddock v. Greenhut Constr. Co.*, 423 F.2d 111, 115 (5th Cir.1970). Dasta, however, cannot demonstrate that a request for an extension of time would have been futile, because Dasta presented no evidence that Marriott ever refused a validly made request. As the district court aptly noted, "[a] failure to ask for or to seek an extension does not give rise to a claim for damages for failure to grant [one]."

24. The presence of express contractual provisions directly addressing Dasta's claims, including the no damage for delay clause, forecloses Dasta from recovering on its *quantum meruit* claim. *See Harding Realty, Inc. v. Turnberry Towers Corp.*, 436 So.2d 983, 984 (Fla. 3d Dist. Ct.App.1983) (recognizing settled rule of Florida law that *quantum meruit* is inappropriate where a valid express contract exists).

tual right simply does not amount to a wrongful act.[25] This fact, along with Dasta's failure to request any extensions of time, is fatal to Dasta's claim for damages due to delay, "impact," and "inefficiency."[26] In short, the contracts defined the only remedy available to Dasta, and Dasta failed to pursue that remedy.

## IV.

 The final issue for our determination concerns Dasta's claim of entitlement to the outstanding amounts on its contracts with Marriott. Although the jury found that "the amount of the unpaid contract balance that Dasta is entitled to recover" is $2,452,311.00, the parties agree that the actual amount owed Dasta on the contracts totals $509,-358.49. Also undisputed is the fact that Dasta expressly authorized Marriott to reduce the amount owed under the contracts to reflect the $292,000 in payments that Marriott made directly to Dasta subcontractors and suppliers. Thus, both parties agree that the final amount left owing Dasta on the contracts totals $217,358.49.[27]

In addition to the $292,000 in payments credited by Dasta, however, Marriott demonstrated at trial that it paid an additional $278,114.28 [28] directly to Dasta subcontrac-

---

25. Moreover, the fact that Marriott was entitled, under the contracts, to engage in the type of conduct challenged by Dasta also is fatal to Dasta's claim of negligent supervision.

26. In a final attempt to circumvent the application of the no damage for delay clause, Dasta claims that the clause is inapplicable in the instant case because Dasta's damages are for "inefficiency of labor" and "impact" costs, rather than "delay" costs. According to Dasta, there can be no delay damages "unless there is a prolongation of performance beyond the anticipated date of completion." *Paul Hardeman, Inc. v. United States*, 406 F.2d 1357, 1361, 186 Ct.Cl. 743 (1969). Since Dasta completed its performance on time, it reasons that there were no

delay damages and that the no damage for delay clause cannot be a bar to its recovery.

We disagree. As a preliminary matter, *Hardeman* plainly is distinguishable because it addressed a situation in which the complained-of costs would exist regardless of whether a delay occurred; here, on the other hand, Dasta's damages were due to the delay and, hence, are precisely of the type addressed by the no damage for delay clause. In its own brief, Dasta states that it was delayed due to Marriott's actions and that these delays, by impacting upon Dasta's time of performance, caused the labor inefficiencies that are the subject of Dasta's claim. We are unmoved by Dasta's creative attempt to label its way around the no damage for delay clause.

27. At trial, Dasta presented the following as the final accounting of its contracts with Marriott:

| | | | |
|---|---|---|---|
| A. | VC–109 Exterior Skin: | | |
| | Original Contract | $3,109,850.00 | |
| | Plus Adjustments | 3,086,342.16 | |
| | (Change of Contract 1–19) | | |
| | Less Payments | (5,791,214.65) | |
| | (Direct to Dasta) | | |
| | Subtotal A | | $404,977.51 |
| B. | VC–125 P.S. Drywall: | | |
| | Original Contract | $1,749,050.00 | |
| | Plus Adjustments | 169,249.59 | |
| | (Change of Contract 20–22) | | |
| | LESS: | | |
| | Payments | (1,813,918.61) | |
| | (Direct to Dasta) | | |
| | Subtotal B | | 104,380.98 |
| | Subtotal A & B | | 509,358.49 |
| | LESS | | |
| | Authorized Payment by Marriott to Dasta Sub-contractors and Suppliers | | (292,000.00) |
| | TOTAL | | $217,358.49 |

28. Dasta and Marriott agree that Marriott paid $570,114.28 either to Dasta suppliers and subcontractors or to satisfy the various liens placed on the Resort; they disagree, however, on the percentage of this amount that was "authorized" by Dasta. Because Marriott is credited for all

tors and suppliers in order to extinguish liens placed on the Resort after Dasta failed to compensate them for their work on the project. Marriott asserts, and the district court found, that this amount should be applied as a set-off to the outstanding contract balances owed to Dasta. We agree.

According to General Condition Item 25, Dasta agreed not to permit its subcontractors and suppliers to place any liens on the Resort property. Moreover, "in the event that any such lien shall be filed, [Dasta] agrees to take all steps necessary and proper for the release and discharge of such lien ... and in default of performing such obligation, agrees to reimburse the Owner, on demand, for all monies paid by Owner in releasing, satisfying, and discharging of such liens."

Accordingly, Dasta was obligated to remove all mechanics' liens placed on the Resort by its suppliers and subcontractors. Dasta failed to abide by this provision, and because the additional amounts paid by Marriott exceed the outstanding balances owed Dasta, Marriott is entitled to set-off the entire remaining amount of the outstanding contract balances.[29]

## V.

Dasta's failure to comply with the contractually-provided measures for relief bars Dasta from recovering for its delay, impact, and inefficiency damages. Dasta also cannot recover its outstanding contract balances because those amounts were offset by payments made by Marriott on Dasta's behalf.

Accordingly, the district court's grant of judgment notwithstanding the verdict is AFFIRMED.

IT IS SO ORDERED.

PAINE, Senior District Judge, dissenting:

I agree with the majority's holding that the trial court properly interpreted the no-damages-for-delay clause of the contract. I join the majority and would affirm on this issue if it were the only issue before this court for consideration. However, because the issue of whether Dasta has established a recognized exception to enforcement of the no-damage-for-delay clause is also before the court, I cannot concur with the majority opinion. It fails to address the exception.

I dissent from the majority opinion because the majority affirms the district court's entry of judgment notwithstanding the verdict which was based in part upon the finding that there was insufficient evidence to support the jury's factual conclusion that Marriott deliberately interfered with Dasta's performance. The majority does not address the issue of deliberate interference with Dasta's performance, which would constitute a legally permissible exception to the enforcement of the no-damages-for-delay clause against Dasta. Rather, the majority holds that it is unnecessary to determine whether Marriott actively interfered with Dasta's performance, because, as a preliminary matter, Dasta failed to request an extension of time, as required by the contract's no-damage-for-delay clause.[1] In my opinion, the majority's

---

payments, authorized or otherwise, the distinction is immaterial.

**29.** $278,114.28 (unpaid liens) − $217,358.49 (outstanding balances on contracts) = $60,755.79. Because Marriott did not take a cross-appeal on its claim against Dasta from the judgment entered by the district court, under which Marriott was not entitled to recover the amount it paid in excess of the contract balance, we need not determine whether Marriott, in fact, could have recovered the additional $60,755.79 from Dasta.

**1.** Because the majority thought it was unnecessary, it did not undertake an analysis of the deliberate interference exception to enforcement of the no-damages-for-delay clause. However, while the majority opinion does not provide an

analysis of this issue, a close reading of the opinion reveals that it does offer a conclusion with respect thereto. Specifically, the majority concludes:

> Our analysis of the contract documents in this case leads us to the inescapable conclusion that Dasta has no claim, under those documents, for the injuries it purportedly suffered at the hands of Marriott. *Our analysis of the evidence leads us to the identical conclusion: Dasta has no claim under any of the theories or recovery it advances.* [emphasis added]

While I agree with the former conclusion, I cannot agree with the latter because I conclude that Dasta has a claim under at least one of the theories it advances, *to wit*, it may recover pursuant to the legally recognized deliberate interfer-

holding that the district court correctly found that Dasta failed to seek its contractual relief of an extension of time is not determinative of this entire case.[2] The majority's conclusion on this single issue does not obviate its duty to review the district court's entry of judgment notwithstanding the verdict on the issue of the exception, wherein the district court substituted its version of the facts for the jury's verdict that Marriott deliberately interfered with Dasta's performance under the contract. The real issue of contention with the majority opinion is that the undersigned would hold that the exceptions recognized by Florida law take Dasta's right to recover damages outside of the contract and do not require Dasta to make a written request for extension of time in order to recover damages. Therefore, Dasta's failure to comply with the contractual requirements regarding delay does not bar recovery for damages caused by deliberate interference. While the majority contends that my position would frustrate the bargained-for agreement of the parties, I maintain that the majority's position frustrates Florida law which does not require a written request for an extension of time in order to recover damages for deliberate interference.

## Legal Analysis

*The Jury's Verdict on Liability Should Stand*

The subject contract contained an enforceable no-damages-for-delay clause which, as the majority correctly notes, limited Dasta's remedy under the contract to an extension of time and further prohibited Marriott's liability to Dasta for money damages sustained as a result of delays occasioned by Marriott.[3] However, it is well settled in Florida that a no-damages-for-delay clause does not preclude recovery for delays resulting from a party's fraud, concealment, or active interference with performance under the contract. *See United States for the Use and Benefit of Seminole Sheet Metal Company v. SCI Inc.*, 828 F.2d 671 (11th Cir.1987); *C.A. Davis, Inc. v. Miami*, 400 So.2d 536 (Fla. 3d Dist.Ct. App.1981), *pet. for review dismissed* 411 So.2d 380 (Fla.1981); *McIntire v. Green–Tree Communities, Inc.*, 318 So.2d 197 (Fla. 2d Dist.Ct.App.1975). Therefore, even where a contract contains a no-damage-for-delay clause, money damages may be awarded upon a showing of "knowing delay" which is sufficiently egregious, *see Southern Gulf Utilities Inc. v. Boca Ciega Sanitary District*, 238 So.2d 458 (Fla. 2d Dist.Ct.App.) *cert. denied*, 240 So.2d 813 (Fla.1970), or upon a showing of willful concealment of foreseeable circumstances which impact timely performance. *See McIntire v. Green–Tree Communities, Inc.*, 318 So.2d at 199. As noted by this Circuit in *Seminole Sheet Metal*, these valid exceptions to the no-damages-for-delay clause are consistent with and predicated upon a contracting party's implied promise not to hinder the other party's ability to perform its contractual obligation. *Seminole Sheet Metal*, 828 F.2d at 675.

---

ence exception. The majority's holding is especially troublesome because its stated version of the facts fully support Dasta's argument that it may recover damages pursuant to this exception. Even the majority acknowledges that because we are reviewing the propriety of the district court's entry of judgment notwithstanding the verdict, we accept as true Dasta's version of the events.

2. I maintain that the contractual provisions including General Condition 7B should not bar Dasta from recovery pursuant to the non-contractual entitlement to damages for deliberate interference. Proof of this exception does not require, and in my opinion it would be illogical to require, that a party who is the victim of deliberate interference seek from the deliberate interferer, an extension of time in writing in order to recover damages for deliberate interference with its performance under the contract.

By the very nature of the exception, Marriott's deliberate interference was impeding Dasta's performance of its obligations under the contract. Therefore, in my view, it is unfair to hold, as the majority does, that Dasta could not recover damages for Marriott's deliberate interference because it had not fully performed its obligations under the contract.

3. I do not take issue with the majority's conclusion that Dasta's failure to request an extension of time prohibited it from avoiding the barrier to recovery of damages for delay pursuant to the no-damages-for-delay clause. However, as stated in greater detail, *infra*, I do not agree with the majority's legal conclusion that the lack of a legitimate request for an extension of time prohibits Dasta's recovery of damages pursuant to the recognized exceptions to the enforcement of a no-damage-for-delay clause.

Therefore, while no-damages-for-delay clauses are enforceable under Florida law, Florida also recognizes certain exceptions to their enforceability. Where, like in the case before us, facts and circumstances constituting an exception exist, the no-damages-for-delay clause is rendered unenforceable. Despite the bar to enforcement created in this case by the well recognized deliberate interference exception, the majority mistakenly enforces the terms of the no-damages-for-delay clause to Dasta's detriment and in such a way so as to preclude the applicability of *any* recognized exception to the clause's enforceability. In my opinion, the majority's failure to consider the applicability of the deliberate interference exception is error.

On this issue, the majority holds that *"where a legitimate request for an extension is made and subsequently refused,* a no damages for delay clause will not bar recovery where the delays were caused by the owner's fraud, concealment, or active interference with performance." [emphasis added to call attention to that portion of the holding with which I take issue]. In support of this legal conclusion, the majority cites *Seminole Sheet Metal* and *Southern Gulf.* Neither case supports this holding.[4] Specifically, neither case

requires as a condition precedent to recovery pursuant to a legally recognized exception to the enforcement of a no-damages-for-delay clause, that a complaining party make a "legitimate request for an extension." In *Southern Gulf,* the court noted that a contractor seeking to overcome the damages prohibition of such a clause cannot "sit idle," but the court fell short of requiring that any formal request for an extension was required in order to prevail under the "knowing delay" exception.[5] *Southern Gulf,* 238 So.2d at 459. Accordingly, neither case cited by the majority holds that in order for Dasta to recover pursuant to the deliberate interference exception, it was required to seek an extension through written notice. This was required of Dasta only if it sought recovery through the contract itself.[6]

Notwithstanding Dasta's failure to request a written extension of time as required by the very clause which is rendered unenforceable by the recognized exception and the facts of this case, I believe it is necessary to determine whether the record supports the jury's finding that Marriott actively interfered with Dasta's performance, thereby creating an exception to enforcement of the clause against Dasta.[7] Accordingly, I am

---

**4.** In *Seminole Sheet Metal,* this court did not even address the need for a request for an extension or a notice requirement of any kind, or compliance with the terms of the clause as a condition precedent to recovery pursuant to a recognized exception.

**5.** It cannot be said that this record supports a finding that Dasta sat idly by while Marriott caused delays. In addition to the abundant verbal discussions regarding Dasta's concern regarding the delays, the record reveals that Dasta made several attempts to expedite and cure the cause of at least some of the delays. In particular, upon discovery of the concrete problem, Dasta suggested that it undertake to cure the problem long before Marriott asked it to do so; Dasta also asked permission to supply its own vertical transportation to avoid the delays occasioned by Marriott's failure to provide same.

**6.** The majority suggests that my approach would have encouraged Dasta to remain silent about the delays and sue at a later time. This is not an accurate statement of my position, Florida law, or the facts of this case. As I acknowledged, *supra,* Florida law does not permit a complaining party to sit idly by and simply sue later. *See, Southern Gulf,* 288 So.2d at 459. However, Florida law does not require that a complaining

party seek a written extension of time in order to recover for deliberate interference. Additionally, as noted *supra* at note 4, the facts of this case establish that Dasta did not remain silent about the delays.

**7.** On this issue, the undersigned located only one case in this Circuit where the court determined that a ruling on the preliminary issue of enforceability of the clause, obviated the need to address the possible application of the exception to enforceability. In *United States f/u/b/o Pertun Constr. Co. v. Harvesters Group, Inc.,* 918 F.2d 915, 920, a case discussed by the majority only on the preliminary issue of enforceability of the clause and not to justify its failure to address the exceptions thereto, the party seeking to enforce the no-damages-for-delay clause had not fulfilled a contractual duty and the party seeking to avoid the prohibition of the clause was entitled to recover under the clause itself, thereby obviating the need to address the exceptions to enforceability. However, as the majority acknowledged in note 18, *Pertun* is plainly distinguishable from the present case on it facts. In *Pertun,* having determined that the party against whom the no-damages-for-delay clause was being enforced was entitled to recover damages under the clause itself, the court appropriately did not address the

constrained to dissent from the majority opinion and to review the district court's order accordingly.

Upon proper instruction of the above-referenced law, the jury determined as a matter of fact that Marriott deliberately interfered with Dasta's performance, thereby causing delay/acceleration or impact damages. Notwithstanding the jury's factual findings, the district court held that the facts of this case do not support a claim of concealment, fraud, or active interference. For the following reasons I cannot agree that the record before us supports the majority's affirmance of the district court's substitution of its own judgment for the verdict of the jury.

The district court may grant a judgment notwithstanding a verdict if the record reveals either (a) an absence of substantial evidence supporting the jury's verdict, or (b) substantially undisputed and uncontroverted evidence supporting only a legal conclusion contrary to the result reached by the jury. *Miles v. Tennessee River Pulp and Paper Co.*, 862 F.2d 1525 (11th Cir.1989).

Upon *de novo* review of this record, I cannot agree with the district court that the record lacked substantial evidence to support the jury's verdict. Marriott's six month failure to erect a safety net in accordance with federal regulations, its failure to expeditiously resolve problems with the defective concrete work upon which Dasta was to construct exterior skin, and its failure to either timely provide adequate vertical transportation as promised or to permit Dasta to supply its own vertical transportation, not only deliberately hindered Dasta's performance but effectively made it virtually impossible for Dasta to commence work as scheduled in July, 1984. Each of these facts, standing

alone, constitutes substantial evidence to support the jury's finding of deliberate interference. When they are viewed collectively, they surely constitute knowing delay which is sufficiently egregious to support the jury's verdict. Both this conclusion and the jury's verdict are further supported by the unreasonable and undue delay occasioned by Marriott's bad faith failure to timely address and cure the problems causing the initial delay. Accordingly, I would reverse the district's court's entry of judgment notwithstanding verdict in favor of Marriott on the deliberate interference claim, and I would direct the district court to enter judgment in favor of Dasta as to this liability issue.

*Reinstatement of the Jury's Verdict on Damages Would Be Erroneous*

In this appeal, Dasta also seeks reinstatement of the jury's verdict. Notwithstanding my foregoing conclusions regarding liability, I hold that reinstatement of the jury's damage verdict would be erroneous. Upon finding that Marriott deliberately interfered with Dasta's performance, the jury made the following findings regarding damages: 1) there was a contract balance owed by Marriott to Dasta of $2,452,311.00; 2) that Marriott paid to subcontractor's and suppliers on Dasta's behalf $369,402.02; 3) that Dasta was entitled to recover on its delay/acceleration/impact claim $2,207,079.90.[8] Contending that the jury's interrogatory verdict was hopelessly inconsistent and that such inconsistencies could not be resolved without resorting to speculation, Marriott alternatively requested a new trial. I agree that the verdict is hopelessly inconsistent and I would further hold that the verdict is contrary to the great weight of the evidence, thereby warranting a new trial on the issue of damages.

right to recover pursuant to the recognized exceptions. In the present case the majority contends that Dasta's lack of ability to recover under the clause itself, precludes its recovery under any of the recognized exceptions. Because a recognized exception is established under the present set of facts, whether Dasta is entitled to recover under the clause itself is not determinative inasmuch as the exception renders the clause unenforceable against Dasta.

8. Judgment was thereafter entered by the clerk in favor of Dasta for $4,289,989.28 plus interest

from June 1, 1986 in the sum of $2,967,502.60, for a total amount of $7,257,491.88. Dasta moved for a correction of the judgment due to a clerical mistake which Dasta contends was made by erroneously adding together the $2,452,-311.00 which the jury found to be the unpaid contract balance, and the $2,207,079.90, the amount of damages the jury found due and owing on the delay/acceleration/impact claim. Marriott agreed that the two figures were mistakenly added together.

The jury verdict identifies $2,452,311.00 as "the amount of unpaid contract balance that Dasta is entitled to recover." However, Dasta's own Exhibit 182 and its testimony regarding the final accounting of its contracts with Marriott was that the contract balance was $217,358.49.[9] Clearly, no basis exists in the record to support the jury's verdict regarding the amount owed by Marriott to Dasta under the contracts and the jury verdict is, therefore, contrary to the great weight of the evidence.

Further, as noted above, despite the jury's attempted delineation of separate amounts of damages as requested in the interrogatory verdict form, both parties suggested that the two separate figures—the amount of damages due under the contracts and the amount due from the delay/acceleration/impact claim—should not be added together to determine the total amount due to Dasta from Marriott. Apparently urging the court to simply ignore the jury's award of damages on the delay/acceleration/impact claim, Dasta suggested that the amount of the verdict should be $2,452,311.00, the amount the jury erroneously deemed to be due and owing to Dasta under the contracts, plus pre-judgment interest. Dasta's attempt to tailor the verdict in this way would require speculation as to the jury's intent and would further require that this court give effect to a verdict which is clearly not supported by record evidence. Marriott's suggestion that the sums not be added together is an equally arbitrary attempt to reconcile an obviously inconsistent verdict.

It would appear from the verdict form that the jury mistakenly totalled sums for each claim and then duplicated the award of damages on each claim. However, because neither this court nor the district court has any way of knowing what amount the jury attributed to each claim or how exactly it arrived at these inconsistent and factually unsupported verdicts on damages, I would remand the matter to the district court to hold a new trial on the issue of damages. *Ard v. South-*

*west Forest Industries,* 849 F.2d 517, 520 (11th Cir.1988) (a new trial may be granted where the jury verdict is contrary to the great weight of the evidence or will result in a miscarriage of justice).

9. As correctly noted by the majority, the parties do not dispute that Dasta was entitled to $509,-358.49 that was left unpaid on its contracts with Marriott. Also undisputed is the fact that Dasta expressly authorized Marriott to reduce the amount owed under the contracts to reflect the $292,000 in payments that Marriott made directly to Dasta subcontractors and suppliers. Thus, both parties agreed that the final amount left owing on the contracts totals $217,358.49.