828 F.2d 671
 9 Fed.R.Serv.3d 534, 34 Cont.Cas.Fed. (CCH) 75,404
 UNITED STATES of America, for the Use and Benefit of
SEMINOLE SHEET METAL COMPANY, Plaintiff-Appellant,
v.
SCI, INC., f/k/a Sainer Constructors, Inc. and Fidelity and
Deposit Company of Maryland, Defendants-Appellees.
 No. 86-3477.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 28, 1987.
 
 R. Wade Wetherington, Gibbons, Tucker, McEwen, Smith, Miller & Whatley, Tampa, Fla., for plaintiff-appellant.
 Philip N. Hammersley, Trawick & Griffis, Henry P. Trawick, Jr., Sarasota, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before JOHNSON and CLARK, Circuit Judges, and MORGAN, Senior Circuit Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 In this appeal brought under the Miller Act, 40 U.S.C.A. Secs. 270a-270d, Seminole Sheet Metal Co., the successor in interest to Floridaire Mechanical Systems, Inc.,[1] challenges the district court's (1) dismissal of counts related to delay damages, (2) denial of an amendment to conform the evidence to the pleadings, and (3) selection of the date upon which to base prejudgment interest. We affirm in part and reverse and remand in part with directions.I.
 
 
 2
 In 1978, SCI, Inc., and the Veterans Administration (VA) executed a contract for the construction of a hospital in Bay Pines, Florida. Fidelity and Deposit Company of Maryland furnished a payment bond as required by the Miller Act. SHS Associates, an architectural firm, designed the hospital. SCI and Floridaire subsequently executed a subcontract for the heating, ventilating, and air conditioning component of the project.
 
 
 3
 In late December of 1978, Floridaire submitted its choice of fan coil units to SHS for approval. SHS rejected Floridaire's choice, stating that the fan coil units failed to comply with SHS's specifications. Floridaire informed SCI that SHS's prescribed ratio among required gallons per minute, minimum sensible BTUH, and cubic feet per minute was mathematically impossible. Consequently, Floridaire claimed it could not make fan coils meeting those specifications. Floridaire maintained that its choice was the best approximation. After a series of meetings, the VA and SHS eventually agreed to modify the specifications for the fan coil units. In December of 1979, they approved fan coil units very similar to those Floridaire had initially submitted.
 
 
 4
 Floridaire subsequently sued SCI under the Miller Act.[2] Count I of the amended complaint sought the recovery of the subcontract's unpaid balance. Counts II through VI sought damages occasioned by the delay in approving the fan coil units, primarily increased labor and material costs. After the close of Floridaire's case in chief in the nonjury trial, the district court granted SCI's motion to dismiss Counts II through V on the grounds that Floridaire had not proven that the delay in its work was caused by the VA, SCI, or SHS, and that its damages were speculative and unsupported by any evidence. The court also refused to allow Floridaire to amend its complaint pursuant to Fed.R.Civ.P. 15(b) in order to add a claim for the recovery of the increased cost of the fan coil units. Consequently, the court entered judgment in favor of Floridaire for $88,970 with prejudgment interest calculated at 12% from February 15, 1983.
 
 II.
 
 5
 Floridaire contends that the district court improperly dismissed its claims against SCI for damages resulting from the improper specifications for the fan coil units.[3] As to this issue we affirm the district court.
 
 
 6
 Floridaire sought to recover delay damages from SCI by proving that SCI failed to timely resolve inconsistencies and errors in the fan coil drawings and specifications (Count III); that SCI impliedly warranted the validity of the drawings and the specifications (Count IV); and that SCI modified the drawings and specifications as a result of the errors and inconsistencies, thereby creating a constructive change in the subcontract (Count V).
 
 
 7
 The cross-examination testimony of Michael Tappouni, Floridaire's vice president in charge of construction during the time period relevant to this case, indicated that SCI did nothing to impede or impair Floridaire in the submittal approval process (R4-85). Tappouni also admitted that SCI "did not prepare the plans or specifications for the project" and that SCI did not have the responsibility "to approve or disapprove of the submittals in the final analysis" (R4-86). Responsibility for preparation of the specifications and approval of Floridaire's submittal rested with SHS, the hospital's architect. Thus, Floridaire seeks to hold SCI liable for delay damages occasioned by SHS's actions.
 
 
 8
 The subcontract between SCI and Floridaire absolves SCI of liability in such a situation. Paragraph 4(c) of the subcontract specified that:[SCI] shall not be liable to [Floridaire] for delay to [Floridaire]'s work because of the act, neglect or default of [the VA] or [SHS], or fire or other casualty, riots, strikes or combined action of the workmen or others, acts of God, any other cause beyond [Floridaire]'s control, or any circumstance caused or contributed to by [Floridaire].
 
 
 9
 Although this action was brought under the Miller Act, state law governs whether SCI materially breached the subcontract. United States ex rel. Riley v. Diran Co., 597 F.2d 446, 447 n. 1 (5th Cir.1979); United States ex rel. Aucoin Elec. Supply Co. v. Safeco Ins. Co. of Am., 555 F.2d 535, 541 (5th Cir.1977). Florida, where the subcontract was executed and performed, provides the governing law here. Florida courts have upheld the validity of "no damages for delay" clauses. See, e.g., C.A. Davis, Inc. v. City of Miami, 400 So.2d 536, 539-40 (Fla.Dist.Ct.App.), petition for review dismissed, 411 So.2d 380 (Fla.1981); McIntire v. Green-Tree Communities, Inc., 318 So.2d 197, 199 (Fla.Dist.Ct.App.1975). Thus, SCI ordinarily could invoke the "no damages for delay clause" to avoid liability for SHS's actions.[4]
 
 
 10
 A "no damages for delay" clause, however, does not immunize a contracting party for delays caused by that party's fraud or concealment or by that party's active interference. C.A. Davis, 400 So.2d at 539-40; McIntire, 318 So.2d at 199. This restriction comports with a contracting party's implied promise not to hinder the other party's ability to perform its contractual obligation. Casale v. Carrigan & Boland, Inc., 288 So.2d 299, 301 (Fla.Dist.Ct.App.), appeal dismissed, cert. dismissed, 301 So.2d 100 (Fla.1974). Furthermore, the subcontract here allowed Floridaire to communicate with SHS only through SCI. Consequently, SCI assumed an additional duty of assisting Floridaire with its complaints to SHS. Id.
 
 
 11
 Nothing indicates that SCI engaged in fraudulent conduct or concealed the flawed specifications from Floridaire. Indeed, Tappouni testified on cross-examination that Floridaire knew SCI lacked the expertise to evaluate the correctness of the specifications, to prepare submittals, and to judge whether the submittals met the specifications. (R4-85). Tappouni knew that Floridaire had the responsibility of evaluating the correctness of the specifications and of preparing the submittals. Id.
 
 
 12
 Furthermore, nothing indicates that SCI actively interfered with Floridaire's performance. The district court found that "SCI, Inc. acted promptly and properly during the submittal process and did not cause the delay, as shown by the testimony of the plaintiff's vice president." Based upon Tappouni's testimony (R4-85), that finding is not clearly erroneous.
 
 
 13
 Floridaire, citing W.F. Magann Corp. v. Diamond Mfg. Co., 775 F.2d 1202 (4th Cir.1985), argues that SCI is liable for the defective specifications regardless of whether it committed fraud or interfered in the approval process. In Magann, the general contractor was held liable to a subcontractor for damages resulting from defective specifications. In so holding, the court did not discuss whether the prime contractor had committed fraud or somehow interfered with the subcontractor's work. Magann, however, is distinguishable for two reasons. First, there is no indication that the subcontract in Magann contained a "no damages for delay" clause. Second, the Army Corps of Engineers, the contracting government agency, calculated the specifications in Magann. Generally in a Miller Act dispute the subcontractor cannot sue the government agency that contracted with the general contractor. See, e.g., Clifton D. Mayhew, Inc. v. Blake Constr. Co., 482 F.2d 1260, 1262 n. 1 (4th Cir.1973). Magann therefore may be premised on the fact that the subcontractor had no remedy except against the general contractor. Here, in contrast, Floridaire could have proceeded directly against SHS. Consequently, Magann should not allow a subcontractor to circumvent a "no damages for delay" clause when the subcontractor can proceed directly against the party that calculated the specifications.
 
 
 14
 Floridaire also seeks to avoid the impact of the "no damages for delay" clause by referencing the first sentence of paragraph 4(c) of the subcontract: "If [Floridaire]'s performance of this subcontract is delayed by acts of [the VA, SCI] or other subcontractors, [Floridaire] may request an extension of time for performance, but [Floridaire] shall not be entitled to an increase in the subcontract price or damages because of the delay except to the extent that [SCI] is entitled to compensation from [the VA]." Floridaire's resort to this provision is misplaced. Counts III through V seek recovery based upon SCI 's breach; these counts do not seek recovery based upon SHS 's breach. Because SCI would not be entitled to compensation from the VA if SCI had breached the subcontract, this provision is simply inapplicable to Counts III through V.
 
 
 15
 Finally, Floridaire's appeal to equity is unavailing. Floridaire argues that it should be permitted to proceed against SCI because SHS may have insufficient assets and because SCI executed the payment bond to protect Floridaire. Both in its brief and at oral argument, Floridaire conceded that it could have sued SHS. See A.R. Moyer, Inc. v. Graham, 285 So.2d 397 (Fla.1973). A suit against SHS was the proper recourse. Absent liability on its behalf, SCI should not have to sacrifice the payment bond designed only to protect Floridaire from SCI's default.[5]
 
 III.
 
 16
 Floridaire argues that the district court erred in rejecting Floridaire's posttrial request to amend Count I to include a claim to recover money paid to SCI pursuant to a settlement stipulation with the VA. We reverse the district court and direct it to enter judgment for Floridaire on the claim related to the VA-SCI settlement.
 
 
 17
 In Count I, Floridaire sought to recover the balance due under the subcontract. Floridaire originally stated that amount as $128,675. After the district court dismissed Counts II through V, Floridaire amended that amount to $88,970. Floridaire then sought to amend Count I to add a claim for $20,573.28, an amount representing the additional procurement cost of the fan coil units.
 
 
 18
 During trial, Floridaire entered into evidence a settlement stipulation between the VA and SCI (Plaintiff's Exhibit 23). SCI did not object to its admission. The settlement stipulation provided that "[t]he Veterans Administration agrees to reimburse SCI, Inc. for additional fan unit procurement costs in the amount of $20,573.28." Floridaire, the actual purchaser of the fan coil units, claimed that the second clause of the subcontract (related to "payment") entitled it to the money as a payment "actually received attributable to the Subcontractor's work." The district court did not permit the amendment.
 
 
 19
 Fed.R.Civ.P. 15(b) guides our analysis. That rule provides:
 
 
 20
 When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.
 
 
 21
 Thus, the district court was required to allow the amendment if the issue of whether Floridaire was entitled to the amount paid SCI under the settlement stipulation was tried by either express or implied consent of the parties. Borden, Inc. v. Florida E. Coast Ry., 772 F.2d 750, 757-58 (11th Cir.1985).
 
 
 22
 Failure to object to evidence raising issues outside of the pleadings constitutes implied consent as long as the evidence is not relevant to issues already within the pleadings. International Harvester Credit Corp. v. East Coast Truck & R.V. Sales, Inc., 547 F.2d 888, 890 (5th Cir.1977). SCI argues that the evidence concerning the settlement stipulation was relevant to measuring damages for delay under Counts II through V. As a result, SCI contends, it was not on notice that the evidence was raising a new claim. Although the evidence was relevant to the issue of damages, it addressed a different basis of liability. As noted above, Counts II through V sought recovery for SCI's breach of the subcontract. Floridaire premised Count I on paragraph 2 of the subcontract:
 
 
 23
 [SCI] shall pay [the agreed contract price] to [Floridaire], subject to the other provisions hereof, including additions and deletions as herein provided, payment to be made for actual work performed in accordance with the contract documents and in a good and workmanlike manner and to be made on the basis of, and only to the extent of, payment for such work actually received by [SCI] from [the VA].
 
 
 24
 As noted in the discussion in part II above, the first sentence of paragraph 4(c) addresses SCI's liability when it acts as a conduit for Floridaire's claims against the VA. As part of its conduit role, SCI entered into the settlement stipulation. The settlement of $20,573.28 thus constituted a legitimate addition to the contract price; the increased fan unit procurement cost related to work done by Floridaire and the settlement amount was a "payment for such work actually received by [SCI] from [the VA]." Thus, the evidence that the VA had paid SCI for the additional procurement cost "was much more strongly relevant" to the theory that the subcontract required SCI to transmit that payment to Floridaire, "and this should have been apparent to defense counsel." Wallin v. Fuller, 476 F.2d 1204, 1210 (5th Cir.1973).
 
 
 25
 Courts, however, will not find implied consent if the nonmoving party would be prejudiced by the injection of the new issue. Cioffe v. Morris, 676 F.2d 539, 541-42 (11th Cir.1982). SCI suffered no prejudice. Exhibit 23 was admitted into evidence before SCI presented its case. Had it required extra time to prepare, SCI could have requested a continuance under rule 15(b). Furthermore, SCI has not pointed to any evidence it would introduce to rebut Floridaire's claim. Consequently, resolution of Floridaire's claim required only an interpretation of the subcontract, already in evidence.
 
 
 26
 Nor did Floridaire act in bad faith by raising this claim at trial. Wallin, 476 F.2d at 1211. Floridaire commenced this action in 1981. The VA and SCI executed the settlement stipulation in early 1983. Floridaire thus could not have raised this claim in its initial pleadings.[6]
 
 IV.
 
 27
 In awarding Floridaire $88,970 as the final installment due it under the contract, the district court also awarded Floridaire prejudgment interest at 12%, compounded annually, commencing on February 15, 1983. We reverse the district court in part, concluding that the interest should run from February 22, 1982 for part of the judgment and from February 15, 1983 for the remainder.[7]
 
 
 28
 Under the Miller Act, whether to allow prejudgment interest is a matter of federal law. United States ex rel. Ga. Elec. Supply Co. v. United States Fidelity and Guar. Co., 656 F.2d 993, 997 (5th Cir. Unit B Sept. 1981); see also F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974) ("scope of the remedy" under Miller Act is matter of federal law). Because, however, the Miller Act does not provide any explicit standards for awarding prejudgment interest, it is treated as incorporating state law on this issue. Georgia Electric, 656 F.2d at 997. Consequently, Florida law guides our analysis.
 
 
 29
 On actions ex contractu, prejudgment interest runs from the date a liquidated debt is due, even if a genuine dispute exists as to whether the debt is in fact due. Cooper v. Alford, 477 So.2d 31 (Fla.Dist.Ct.App.1985); Broward County v. Sattler, 400 So.2d 1031, 1033 (Fla.Dist.Ct.App.1981). A claim is liquidated if a conclusive determination of the exact amount due can be made at the time of demand for payment. Chadwick v. Corbin, 476 So.2d 1366, 1368 (Fla.Dist.Ct.App.1985), review denied, 488 So.2d 67 (Fla.1986). Thus, a claim is unliquidated if the amount of damages cannot be computed except on conflicting evidence, inferences, and interpretations. Town of Longboat Key v. Carl E. Widell & Son, 362 So.2d 719, 723 (Fla.Dist.Ct.App.1978).
 
 
 30
 The subcontract between Floridaire and SCI provided that payments were
 
 
 31
 to be made on the basis of, and only to the extent of, payment for such work actually received by [SCI] from [the VA]. Payment shall be made within a reasonable time after receipt by [SCI], less a retainage of ten per cent in addition to any withheld by [the VA]. Final payment shall be made by [SCI] upon acceptance of work by, and payment by, [the VA].... If [the VA] does not pay [SCI] for any reason, ... [SCI] has no obligation to pay [Floridaire] except for the amounts actually received attributable to [Floridaire]'s work.
 
 
 32
 The subcontract further provided that SCI would "not be entitled to receive final payment under this subcontract until the entire amount of work to be done has been accepted by [the VA]."
 
 
 33
 The VA transmitted its final voucher to SCI on February 22, 1982. The VA withheld $5,000 for punch list items and $76,055 for liquidated damages, amounts attributable in part to alleged deficiencies in Floridaire's work on the hospital project. On February 15, 1983, the VA, having rescinded the assessment of liquidated damages against SCI, made its final payment to SCI.
 
 
 34
 SCI owed Floridaire $88,970, a liquidated sum representing the subcontract balance SCI owed Floridaire. SCI, however, was obligated to pay that total in two separate installments. Excepting the $81,055 withheld by the VA, an excess of $7,915 remained. The subcontract entitled SCI to retain 10% of that amount ($791.50). Consequently, SCI owed Floridaire $7,123.50 once the VA transmitted its final voucher on February 22, 1982.[8] Thus, prejudgment interest should run from that date on that amount with interest running on the remainder ($81,846.50) from February 15, 1983.[9]
 
 
 35
 For the reasons stated above, we AFFIRM IN PART, and REVERSE and REMAND IN PART WITH DIRECTIONS.
 
 
 
 [1]
 As a matter of clarity, "Floridaire" will be used throughout this opinion
 
 
 [2]
 The parties have stipulated that Fidelity can raise the same defenses as those raised by SCI
 
 
 [3]
 In Count II of its amended complaint, Floridaire alleged that SCI failed to present Floridaire's objections in a timely manner to the United States. Floridaire does not challenge the district court's dismissal of this count
 
 
 [4]
 In addition, the VA hired SHS. SCI therefore is not implicitly responsible for SHS on account of having employed its services
 
 
 [5]
 Because we conclude that SCI did not breach the subcontract and thus the district court properly dismissed Counts III through V, we have no need to address whether Floridaire satisfied its burden of proving damages
 
 
 [6]
 SCI also argues that Floridaire is estopped from seeking an additional amendment because it had previously amended Count I to reduce the amount sought. We find the estoppel argument unpersuasive. Rule 15(b) contains no limitation on the number of amendments that can occur. In addition, the claim for the amount paid by the VA was for an amount in addition to the remainder of the base contract price Floridaire initially sought in Count I. The two amendments thus addressed different claims
 
 
 [7]
 Prejudgment interest should also run from February 15, 1983 for the $20,573.28 that SCI received from the VA to settle the claim for increased fan unit procurement costs
 
 
 [8]
 SCI seeks to avoid this result by pointing to paragraph 19(f) of the subcontract. That provision provides "[SCI] may retain any sum due to [Floridaire], regardless of a default, from any payment due or to become due [Floridaire], including liquidated damages and indemnification losses, sufficient to protect [SCI] from any claim or demand asserted against [SCI] by a third party arising out of the work until the claim or demand is satisfied." SCI's argument is unavailing. Paragraph 19(f) only restates SCI's basic obligation to pay Floridaire "for the amounts actually received attributable to [Floridaire]'s work." As noted in the text, that figure works out to $7,123.50
 
 
 [9]
 Floridaire argues that the final payment became liquidated on March 18, 1981, the date the subcontract specified that the final installment of $88,970 became due. Floridaire's argument must fail. The subcontract did not require SCI to make the final payment to Floridaire until SCI had received its final payment from the VA. The "final payment" provision was not triggered until the VA made its final payment on February 15, 1983