**UNITED STATES of America, on Behalf of and for the Use of the BALF CO., Plaintiff,**

v.

**The CASLE CORPORATION, et al., Defendants.**

**No. 3:94–cv–162(DJS).**

United States District Court, D. Connecticut.

Aug. 10, 1995.

Thomas F. Morgan, Robert Berman Shapiro, Cohn & Birnbaum, P.C., Hartford, CT, for plaintiff.

Gerald L. Garlick, Linda Clifford Hadley, David G. Chabot, Leventhal, Krasow & Roos, P.C., Hartford, CT, for defendants.

## MEMORANDUM OPINION AND ORDER

SQUATRITO, District Judge.

### I. INTRODUCTION

Use Plaintiff, the Balf Co. ("Balf"), filed this action against Defendants, the Casle Corporation ("Casle") and the American Insurance Company ("American"), on February 2, 1994.[1] It alleges violation of the Miller Act, 40 U.S.C. § 270b, and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–100a et seq. Balf seeks compensatory and punitive damages, interest and attorneys' fees.

This matter was tried before the court on April 5, 6, 11 and May 4, 1995.[2] Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law. For the reasons stated below, the court finds that judgment is due to be entered in favor of Balf on the Miller Act claim and in favor of Defendants on the CUTPA claim.

---

1. Balf and Casle are Connecticut corporations. Stipulation of Facts ("SOF") ¶¶ 2–3. American is a Nebraska corporation with a Connecticut office. Id. ¶ 4.

2. At trial, the court heard the testimony of Edward Gilligan ("Gilligan"), Christopher Hamilton ("Hamilton"), James Grant ("Grant"), Clar-ence Welti, Ph.D. ("Welti") and Robert Franklin ("Franklin"). Gilligan is the Executive Vice President of Balf. Hamilton and Grant are Balf employees. Welti was the Government's expert during the construction in question. Franklin is an officer of Casle and was the manager of the construction in question.

## II. BACKGROUND

On or about November 21, 1991, Casle entered into a written contract ("the Contract") with the United States of America ("the Government"), acting by and through the United States Postal Service ("USPS"), for construction of a public building known as the Elmwood Branch facility in West Hartford, Connecticut ("the Project"). SOF ¶ 5. The Contract price exceeded $25,000.00. *Id.* In accordance with the provisions of the Miller Act and the Contract, Casle as principal, together with American as surety, duly executed and delivered a payment bond ("the Bond") to the Government. *Id.* ¶ 6.

In October 1991, Casle entered into a written contract with D.J. King Trucking & Excavating, Inc. ("D.J. King"), wherein D.J. King agreed to furnish the Project with a portion of the labor, equipment and material necessary to complete the site work and bituminous paving provided for under the Contract. *Id.* ¶ 8. Under this subcontract, D.J. King's work was to be completed on or before September 21, 1992. Pl.'s Ex. 3. D.J. King's performance was, however, delayed. Casle attributed the delay to: bad weather, the underlying clay, and lack of equipment and manpower on D.J. King's part. SOF ¶ 17.[3]

On or about September 23, 1992, D.J. King entered into an agreement with Balf. Pl.'s Ex. 4A. Under it, Balf agreed to be responsible for the placing and bituminous paving of the binder and top courses of the Project's parking lot. *Id.;* SOF ¶ 10.[4] Under the terms of the agreement, Balf's work was to be completed on or before November 15, 1992. Pl.'s Ex. 4A at 2. Its work could not begin, however, until after D.J. King had completed working on the subbase and base levels below the binder and top courses.[5]

As of October, 1992, D.J. King had still not completed the portion of the work in the Project's parking lot for which it remained directly responsible. *Id.* ¶ 21. Moreover, during October and November, extensive repair and support work had to be done on the subsoil in the parking lot. The repairs were necessary because the soil had become extremely saturated. The repair and support work included the removal of the unsuitable subsoil and the subsequent replacement thereof with geotextile fabric, concrete mudslabs and new processed aggregate. *See id.* ¶ 21.

Due to the delays, Balf was not able to begin its paving work until late November, 1992. *Id.* ¶ 23. When it did attempt to do so, paving was very difficult because of the wet conditions. For example, while Balf was paving, it hit soft spots which started to pump, i.e. water seeped out of the soil. *Id.* ¶ 25. There were also areas where the ground weaved and the pavement rolled as it was paved. *Id.* Accordingly, Casle, Balf and D.J. King believed the area was too unstable to pave. *Id.*

As of November 30, 1992, the area to be paved was still pumping water and Balf's paving work had to be postponed. *See id.* ¶ 29.[6] Upon the orders of the USPS and Casle, Balf placed the binder course on December 1 and 2. This work was done to protect the extensive repair and support work from the winter elements as well as to allow the soil saturation problems to drain and correct themselves.[7] At the time Balf placed the binder course and stopped working on the Project, approximately fifty percent of the work under its agreement with

---

3. The site on which the Project was built had soft subsoil conditions. *Id.* ¶ 14. It also had a clay underlayment. *Id.*

4. D.J. King had been responsible for this work. SOF ¶ 11. As a result of entering into their agreement, Balf became D.J. King's subcontractor and thereby subject to the protections of the Miller Act. *Id.* ¶ 10.

5. D.J. King's obligations to Casle included the preparation of the subgrade and the furnishing and installation of the process aggregate subbase for the Project's parking lot. SOF ¶ 9.

6. Casle attributed the problems at the Project to either ground water or surface water staying on top of the clay subsurface and coming up through the processed aggregate subbase and pavement. *Id.* ¶ 32.

7. Nonetheless, as of January 5, 1993, water was still pounding and flowing out of the concrete in the parking lot. *Id.* ¶ 33.

D.J. King remained unfinished.[8]

On May 12, 1993, at Casle's request, Balf's personnel returned to the site to perform work on the binder course. SOF ¶ 49. This work had to be done prior to the placing of the top course. Balf's work on May 12 involved a seven man crew, including an asphalt roller operator, paving equipment, and the supplying of 3.09 tons of Class 1 binder patch. In sum, pavement was dug up, patched and rolled. *Id.* In addition to hand tools, a roller and a small truck were utilized to perform the work. *Id.*

Casle terminated its subcontract with D.J. King in late June, 1993.[9] It then proceeded to complete the Project's site work on its own. This process included the direct hiring of Balf to perform paving via a contract dated June 22, 1993. *Id.* ¶¶ 55–56; Pl.'s Ex. 31. At the time Casle entered into its contract with Balf, it was aware that D.J. King had not paid Balf in full. *Id.* ¶ 63.[10] Balf finally placed the top course of paving in the Project's parking lot in June, 1993. *Id.* ¶ 62.

On August 3, 1993, Balf made a demand upon Casle and American for the payment of sums due it, the principal of which totalled $76,688.05. *Id.* ¶¶ 50, 65. They refused to pay.[11] This lawsuit followed.

## III. FINDINGS OF FACT & CONCLUSIONS OF LAW

### A. The Miller Act

The Miller Act provides that, with certain exceptions not relevant here, the prime contractor of construction work on any public building or work exceeding $25,000.00 shall furnish a performance bond for the protection of the United States and a payment bond "for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person." 40 U.S.C. § 270a(a).

As a prerequisite to an action on a payment bond, § 270b(a) requires a written notice be given to the prime contractor. The timely giving of the required notice is a condition precedent to the successful maintenance of the suit. *Fleisher Eng'g & Constr. Co. v. United States*, 311 U.S. 15, 18–19, 61 S.Ct. 81, 83, 85 L.Ed. 12 (1940); *United States ex rel. General Elec. Co. v. H.I. Lewis Constr. Co., Inc.*, 375 F.2d 194, 198 (2d Cir. 1967). In pertinent part, § 270b(a) reads:

> any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within *ninety days* from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. . . .

40 U.S.C. § 270b(a).

Sections 270a and 270b(a) strike a balance. By allowing a person with a "direct contractual relationship" with a subcontractor to sue on the bond, the statute protects and benefits those who have "furnished or supplied" mate-

---

8. Communications between the various parties working on the Project continued throughout the winter. In a letter dated January 16, 1993 and received by Casle on February 1, 1993, D.J. King demanded payment for the paving at the Project. *Id.* ¶ 38. In a letter to the USPS dated February 10, 1993, Casle requested that the completed paving work be paid for in full. *Id.* ¶ 39. *See* Pl.'s Ex. 18 at 2. In a letter from D.J. King to American dated February 11, 1993, D.J. King presented a notice of claim on the Bond, in the amount of $108,753.24. SOF at ¶ 40. In February 1993, Casle requested that Balf return to the site to review the pavement. *Id.* ¶ 44.

9. By letter dated June 23, 1993, Casle advised Balf that D.J. King had been terminated as the site subcontractor on the Project. *Id.* ¶ 57.

10. A portion of the base course work that Balf did for D.J. King was not paid for by the USPS at the time it was done, but was subsequently paid by the USPS to Casle and not paid to either D.J. King or Balf. *Id.* ¶ 64. Casle did not pay this sum because of a dispute between Casle and D.J. King. *Id.*

11. Defendants do not dispute this amount; rather they claim that they are not obligated to pay it. *See* SOF ¶ 50.

rials and/or labor on federal projects. *See H.I. Lewis*, 375 F.2d at 200. But § 270b(a) also protects the prime contractor by requiring those who have no direct contractual relationship with the prime contractor, but have "furnished or supplied" material and/or labor to the project, to provide timely notice of a subcontractor's non-payment. *Id.* Absent such notice, the prime contractor would have no ready means to determine the extent of its ultimate obligations. *See United States ex rel. SGB Universal Builders Supply, Inc. v. Fidelity & Deposit Co.*, 475 F.Supp. 672, 674 (E.D.N.Y.1979).

### B. Count I—The Miller Act Claim

Balf maintains that it is entitled to recover under the Miller Act because it gave Casle and American timely notice. Specifically, Balf contends that its "notice was timely since the labor and materials provided ... in May, 1993 were supplied as a part of the contract between [it] and D.J. King for the Project...." Final Pretrial Order ("FPO") at 13. The court agrees.

#### 1. The Case–In–Chief

■ In cases of this nature, the applicable legal test for determining when the notice period commences is "whether the work was performed ... as a part of the original contract or for the purpose of correcting defects, or making repairs following inspection of the project." *United States ex rel. Austin v. Western Elec. Co.*, 337 F.2d 568, 572–73 (9th Cir.1964). *See Mod–Form, Inc. v. Barton & Barton Co.*, No. 90–CV–71387–DT, 1992 WL 132832, at *1 (6th Cir. June 15, 1992); *United States ex rel. Magna Masonry, Inc. v. R.T. Woodfield, Inc.*, 709 F.2d 249, 251 (4th Cir.1983); *United States ex rel. Noland Co. v. Andrews*, 406 F.2d 790, 792 (4th Cir.1969); *United States ex rel. State Elec. Supply Co. v. Hesselden Constr. Co.*, 404 F.2d 774, 776 (10th Cir.1968); *United States ex rel. General Elec. Co. v. Gunnar I. Johnson & Son, Inc.*, 310 F.2d 899, 903 (8th Cir.1962); *United States ex rel. Raymond A. Bergen, Inc. v.*

*DeMatteo Constr. Co.*, 467 F.Supp. 22, 23–24 (D.Conn.1979); *United States ex rel. Greenwald–Supon, Inc. v. Gramercy Contractors, Inc.*, 433 F.Supp. 156, 162 (S.D.N.Y.1977); *United States ex rel. Air Stream Prods. Co. v. Essential Constr. Co., Inc.*, 363 F.Supp. 681, 682 (S.D.N.Y.1973).[12]

■ It is well established that labor for the purpose of correcting or repairing defects in a completed project, i.e. punch list work, does not serve to toll the notice period of the Miller Act. *Gramercy*, 433 F.Supp. at 162. The rationale for this rule is clear:

> Under the Miller Act a subcontractor may not recover on the bond unless he delivers materials or performs labor called for by the terms of the prime contract and also serves the notice within ninety days after the date of such delivery or performance. If plaintiff could extend the time for notice by correcting a defect ... the time for such notice might remain in chaos and depend upon the discovery of defects in construction over a year or more after completion.... Plaintiff may not in this manner extend the time for the running of the ninety day period.

*United States ex rel. McGregor Architectural Iron Co. v. Merritt–Chapman & Scott Corp.*, 185 F.Supp. 381, 383 (M.D.Pa.1960).

■ Thus, the issue for this court's determination is whether the work performed by Balf on May 12, 1993 was part of its contract with D.J. King. If it was, then Balf's August 3, 1993 claim on the Bond constituted timely notice and it is entitled to recover. If, however, the work was not performed as part of Balf's contract with D.J. King, then its notice was untimely and judgment is due to be entered against it. Accordingly, the court must focus on the contract between Balf and D.J. King and the nature of Balf's May 12, 1993 work, i.e., was it merely punch list work or was it work performed under a contract.

**12.** Defendants argue that the court should employ the "substantial completion" test in evaluating Balf's Miller Act claim. FPTO at 8–15. To date the Second Circuit has not addressed this issue. *See United States ex rel. Luis A. Cabrera v. Sun Eng'g Enters., Inc.*, 817 F.Supp. 1009, 1013–15 (D.P.R.) (discussing split between the circuits on appropriate test), *aff'd* 10 F.3d 805 (1st Cir. 1993). The court, however, finds the test first articulated by the Ninth Circuit in *Western Elec. Co.*, and subsequently adopted by a majority of courts, to be well reasoned and believes that the Second Circuit would adopt it.

As previously discussed, under its agreement with D.J. King, Balf was to place the binder and top courses in the parking lot on or before November 15, 1992. Pl.'s Ex. 4A at 2; Tr. at 134–35 (Franklin's Test.).[13] D.J. King remained responsible for the completion of the subbase and base levels, below the binder and top courses. *Id.* at 134–35; SOF ¶ 9. Balf's work could not begin until after D.J. King had completed its work.

Shortly after the Balf–D.J. King agreement was executed, however, the conditions at the Project site changed drastically. *See* Tr. at 101–03 (Welti's Test.) Whereas in mid-September the parking lot was ready to be paved, the same was not so a month later. By October 15, the soil and subsoil on which the paving was to be done had become extremely saturated with water and could not support paving equipment. *Id.* at 102. *See* Pl.'s Ex. 6. In fact, paving equipment sank into the soil leaving holes between 18 and 24 inches deep. Tr. at 105 (Welti's Test.). As a result of the wet soil conditions, the paving was halted.

In a letter dated October 15, 1992, Welti, the USPS's representative and expert, made recommendations on how to correct the conditions. Pl.'s Ex. 6. The recommended corrections were comprehensive in nature. Essentially, he suggested that there should be an excavation of approximately 4 to 5 inches below the disturbed subgrade, i.e., the bottom, and that there should be a layer of 4 inches of concrete inserted. Tr. at 105. *See* Pl.'s Ex. 8 at 7. The design subbase and base could then be placed on top. Tr. at 105. Casle followed Welti's recommendation, via D.J. King and another subcontractor, Simscroft Echo. *Id.* at 138 (Franklin's testimony). Casle received between $65,000.00 and $70,000.00 in compensation for this work, which was considered to be an extra under the Contract. *Id.* at 136–38.

On December 1, Welti was called out to visit the Project site. *Id.* At that time, he observed that some areas had been stabilized, but that they were "weaving" or "pumping" when equipment ran over them. *Id.* at 107. In response to the situation, he recommended that the binder course be placed down with Class IV bituminous mix in order to avoid further damage to the site. *Id.* at 108. *See id.* at 149 (Franklin's Test.).

Welti believed that placing the binder course in December, would allow the subsurface water an opportunity to drain off and dissipate via a drain set up on the east side of the parking lot. *Id.* at 107–08. He further believed that placing the binder course was necessary to protect the extensive repair and support work already done on the base from the winter elements. *Id.* at 109–11. *See id.* at 339 (Franklin's Test.—wanted to seal up the site before the winter). Since the top course could not be put down until after the water dissipated, the strength of the soil was tested and deficiencies in the binder course were corrected, it was anticipated that patching and repair work on the binder course would be necessary in the spring. *Id.* at 109, 112–13, 115 (Welti's Test.), 144, 148–49 (Franklin's Test.). *See* Pl.'s Ex. 14 at 4 (minutes of job meeting held on Dec. 8, 1992 indicate repairs on binder anticipated).

Welti felt that any deficiencies in the binder course could be corrected later and that the top course could be placed in the spring of 1993. *Id.* at 109–11. He fully understood that when Balf placed the binder course, it would not be in an acceptable condition, i.e., a condition where the top course could be placed without substantial work being done later owing to the wet conditions. *Id.* All of the parties, including Casle, expected that Balf, as D.J. King's subcontractor, would correct the deficiencies and place the top course in the spring, and thereby, complete its obligations under its agreement with D.J. King. *See* Tr. at 152–53 (Franklin's Test.).

Casle concurred with Welti's recommendations, *id.* at 111, 136, and directed Balf to put the binder course down. *Id.* at 113 ("[Balf]

---

13. In general, the written agreement set out the specifications for paving a parking lot at the Project. Pl.'s Ex. 4A at 1, ¶¶ A–F. The three specific provisions which are most relevant are contained in ¶¶ 2, 3, and 13. Paragraph 2 states "[t]his entire proposal will expire on *November 15, 1992* and a new proposal will be required for any work not completed." Paragraph 3 reads "[t]his proposal is based on verbal information by the customer." Finally, ¶ 13 states in pertinent part "[P]atching ... [is] *not included.*"

placed it—they had no alternative but to place it and do the best that they could."). *See id.* at 138 (Franklin's Test.); Pl.'s Ex. 7 (Franklin's handwriting on job meeting notes indicate that Casle wanted area "[p]ave[d] ASAP after placement [of impermeable layer over the clay base]."). Although Balf had concerns about the soil conditions and was reluctant to place the binder course and at one point had refused to continue paving, it did so on December 1 and 2. *Id.* at 107. According to both Welti and Franklin, these concerns were justified. *Id.* at 107, 143. Balf could not, however, place the top course in December. *Id.* at 110 (USPS would not have allowed paving to be completed in Fall). Its work through December constituted approximately fifty percent of its obligation under its agreement with D.J. King. *Id.* at 246 (Gilligan's Test.).

In December 1992, work on the Project shutdown for the winter. Nevertheless, communications between the parties continued. In a letter dated January 16, 1993, D.J. King requested payment from Casle for the binder course. Pl.'s Ex. 17. Casle paid D.J. King for a portion of the work done, but D.J. King did not forward any funds to Balf. Tr. at 172. In February 1993, Casle requested that Balf return to the site to review the pavement. SOF at ¶ 44; Pl.'s Ex. 22.

In the spring of 1993, the USPS had questions about the bituminous mix used by Balf. SOF ¶ 48. In a "letter of transmittal" dated April 4, 1993, Casle forwarded bituminous paving core sample test results to Balf and requested that Thomas Avery of Balf telephone Franklin. *Id.* 46. Casle sent the test results to Ball, as D.J. King's paving subcontractor on the Project, seeking comments from it on the results. *Id.* 47. Subsequently, Ball responded to the USPS's questions about the mix. *Id.* 48. In a "letter of transmittal" dated April 6, 1993, Casle forwarded to Balf the minutes of a job meeting dated February 16, 1993. *Id.* ¶ 45; Pl.'s Ex. 23. Item number 34.3.7 refers to several meetings, including a February 2 meeting between Casle and D.J. King. SOF ¶ 45.

On May 12, 1993, in response to a request from Casle, Balf sent a seven man crew to the Project site to patch and repair the pave-ment. SOF at ¶ 49. Balf employees removed and replaced broken areas of blacktop in the binder course so that the top course could be applied. Tr. 49–50 (Hamilton's Test.); *id.* at 123–24 (Grant's Test.); *id.* at 313–14 (Gilligan's testimony). Balf believed that it was working under its contract with D.J. King and billed it for this work. Tr. at 250–51 (Gilligan's Test.); Pl.'s Ex. 25. D.J. King never paid the bill. Tr. at 312.

In a letter dated June 23, 1993, Casle advised Balf that D.J. King had been terminated as the Project's site subcontractor. SOF ¶ 57; Pl.'s Ex. 30. In a contract dated June 22, 1993, Casle and Balf agreed that Balf would complete the outstanding work under the Balf–D.J. King contract. *See* SOF ¶¶ 58–60. The instrument stated that the work to be performed under it "bears no relationship to work previously performed on the site under a contract between D.J. King ... and ... Balf...." Pl.'s Ex. 32 at 1.

In opposition to Balf's claim, Defendants argue that Balf has failed to establish a Miller Act claim under the majority test because its May 12, 1993 work was not required under its contract with D.J. King, i.e., Pl.'s Ex. 4A and because it is irrelevant that the work was done at Casle's request. Such a contention is, however, inconsistent with both the actual conduct of the parties and the purposes of the Miller Act. *Accord Trinity Universal Ins. Co. v. Girdner*, 379 F.2d 317, 318 (5th Cir.1967) (per curiam) (work performed upon demand is under the contract); *United States ex rel. Palmer Asphalt Co. v. Debardelaben*, 278 F.Supp. 722, 724 (D.S.C. 1967) (work provided in spirit of cooperation in order to assure satisfactory performance is under the contract), *aff'd* 388 F.2d 309 (4th Cir.1967).

While the general rule is that modification of a contract requires mutual assent by the parties as to its meaning and conditions, an existing contract may be modified or abrogated by a new contract arising by implication out of the conduct of the parties. *Rowe v. Cormier*, 189 Conn. 371, 456 A.2d 277, 278 (1983) (per curiam); *First Hartford Realty Corp. v. Ellis*, 181 Conn. 25, 434 A.2d 314, 318–19 (1980); *Yale Co-op Corp. v. Rogin*, 133 Conn. 563, 53 A.2d 383, 385–87

(1947). Whether the acts of the parties show intention to modify or abandon the original agreement is a question of fact. *Three S. Dev. Co. v. Santore,* 193 Conn. 174, 474 A.2d 795, 798 (1984).

The evidence before the court and the testimony at trial reveal that the contract executed on October 10, 1992, Pl.'s Ex. 4A, was modified by the parties' conduct. Rather than merely placing the binder and top courses by November 15, 1992, Balf, in November/December 1992, became a reluctant participant in the implementation of Welti's recommendations on how to deal with soil-saturation problems at the Project site. As D.J. King's subcontractor and with both Casle's and D.J. King's approval, Balf placed the binder course at the site in December 1992.

Defendants' contention that Balf's work was governed by the express terms of the original Balf–D.J. King agreement, Pl.'s Ex. 4A, is misplaced. In December 1992, all the parties involved knew that the placing of the binder course was the implementation of Welti's recommended corrections as ordered by Casle. Tr. at 107–11 (Welti's Test.). When Balf placed the binder course, it was neither placing it on stable soil, which was to be the situation under the original agreement, nor was it placing it with the intention of or ability to place the top course within a few days thereafter, which was also to be the situation under the original agreement. *Id.* The binder course was being placed to reduce the saturation, increase stability, and protect the extensive subsoil support work. *Id.* It was expected that the top course would be placed in the spring, thus completing Balf's contractual obligation to D.J. King.

All the parties expected that Balf would return in the spring to get the binder course into a condition where the top course could be properly placed. *Id.;* Tr. at 140–46 (Franklin's Test.). It had been anticipated that the binder course would have to be repaired after the subsurface water had drained off and after it had been exposed to the winter elements. Tr. at 107–11 (Welti's Test.); 140–46 (Franklin's Test.). Thus, Balf's objective was changed and the original Balf–D.J. King agreement was modified.[14] The modification was the result of Casle's and the USPS's demands. On May 12, Balf, at Casle's request, was acting under the modified contract by carrying out the parties' expectations and intentions. *Id.* at 115–16.

The modification of the original Balf–D.J. King agreement is further evidenced by the conduct of the parties between December, 1992 and May, 1993. During the winter, Balf was called upon to inspect the condition of the site. The various job meeting notes which were forwarded to Balf reveal that it was kept informed of how the Project was progressing during the winter months. Thus, as D.J. King's subcontractor, Balf was an active participant in an ongoing contract. It agreed to and was expected to assist in rectifying the wet and unstable soil conditions in the parking lot.

In sum, the court finds that the work performed by Balf on May 12, 1993 was performed as part of its "modified contract" with D.J. King. The work was necessary for the completion of the paving and was intended by all the parties. Tr. at 107–11 (Welti's Test.). *See Gramercy,* 433 F.Supp. at 162. It was neither mere repair work nor punch list work. The work was done in a spirit of cooperation and was significant because without it, Balf could not have properly placed the top course and delivered a "workman-like paved parking lot" as required under its agreement with D.J. King. *See Trinity Universal,* 379 F.2d at 318; *Debardelaben,* 278 F.Supp. at 724. *See also* Tr. at 55, 63–64, (Hamilton's Test.); *id.* at 115–16 (Welti's Test.); *id.* at 140–46, 341–42 (Franklin's Test.).[15] Thus, Balf's August 3, 1993 bond claim was timely.

Accordingly, judgment shall be entered in favor of Balf on its Miller Act claim.

---

14. In placing the binder course in December, Balf followed the orders of the USPS, Casle and D.J. King, and went against its own professional judgment. It is uncontested that Balf's concerns about paving in December were justified.

15. Although Balf only charged D.J. King $107.00 for the May 12 work, it had a value of approximately $900.00. Tr. at 256–62.

## 2. Prejudgment Interest

■ Balf also seeks interest. The amount of prejudgment interest a plaintiff is entitled to under the Miller Act is a question of federal law. *United States ex rel. Treat Bros. Co. v. Fidelity & Deposit Co.*, 986 F.2d 1110, 1120 n. 9 (7th Cir.1993); *United States ex rel. Lochridge–Priest, Inc. v. Con–Real Support Group, Inc.*, 950 F.2d 284, 288 (5th Cir.1992); *United States v. American Mfgs. Mut. Casualty Co.*, 901 F.2d 370, 372–73 (4th Cir.), *cert. denied*, 498 U.S. 851, 111 S.Ct. 143, 112 L.Ed.2d 109 (1990); *United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors*, 834 F.2d 1533, 1541 (10th Cir.1987); *United States ex rel. Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 677–78 (11th Cir.1987). *See F.D. Rich Co. v. United States*, 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974) ("scope of the remedy" under Miller Act is a matter of federal law). Because the Act is silent on the issue, however, state law is an appropriate source of guidance. *Lochridge–Priest*, 950 F.2d at 288; *Western States Mechanical Contractors*, 834 F.2d at 1541; *Seminole Sheet Metal*, 828 F.2d at 678. In this case, the applicable state law is that of Connecticut.

■ Conn.Gen.Stat. § 37–3a states that "[prejudgment] interest at the rate of ten percent, and no more, may be recovered and allowed in civil actions ... as damages for the detention of money after it becomes payable." Whether or not interest is awarded is a matter within the discretion of the trial court. *Prime Management Co. v. Steinegger*, 904 F.2d 811, 817 (2d Cir.1990); *Nor'easter Group, Inc. v. Colossale Concrete, Inc.*, 207 Conn. 468, 542 A.2d 692, 700 (1988). Connecticut courts have interpreted § 37–3a to make the award of interest turn on "whether the detention of the money was wrongful under the circumstances." *Alderman v. RPM of New Haven, Inc.*, 20 Conn. App. 566, 568 A.2d 1068, 1070 (1990) (citations and internal quotation marks omitted). That there was a legitimate dispute between the parties does not mean that an award of prejudgment interest is inappropriate. *Steinegger*, 904 F.2d at 817 (*citing Harris*

*Calorific Sales Co. v. Manifold Sys. Inc.*, 18 Conn.App. 559, 559 A.2d 241, 244–45 (1989)).

■ The court finds that prejudgment interest is warranted. The more difficult issue is the date upon which the calculation of interest shall be based. Balf argues that the appropriate date is either the last date of uncompensated labor, May 12, 1993, or the date on which the surety had definitive knowledge that the amount was due, February 11, 1993. FPTO at 20–21. The court agrees in substance with the reasoning behind Balf's latter contention. It does not, however, agree that February 11, 1993 is the correct date upon which to base the calculation of interest.

In *United States v. Quinn*, 122 F. 65, 66 (2d Cir.1903) (per curiam), the Second Circuit recognized that:

[I]n general, interest, as against the surety, begins to run on the penalty, only from the time of demand upon the surety, or notice to him to pay, or by suit, or something equivalent to demand or notice.

*See United States v. United States Fidelity & Guar. Co.*, 236 U.S. 512, 530–31, 35 S.Ct. 298, 303–04, 59 L.Ed. 696 (1915); *United States v. Reul*, 959 F.2d 1572, 1580–81 (Fed. Cir.1992). A number of federal courts have applied this settled rule in Miller Act cases. *American Auto Ins. Co. v. United States*, 269 F.2d 406, 412 (1st Cir.1959) ("[I]nterest can be charged against the surety only from the date of demand on it, because until then the surety is not in default."); *Golden West Constr. Co. v. United States*, 304 F.2d 753, 757 (10th Cir.1962) ("[T]he prevailing rule requir[es] a demand for payment upon the surety in order to activate interest liability.").

As previously discussed, the Miller Act strikes a delicate balance between providing security for the suppliers of labor and materials to government projects and protecting the prime contractors from never ending claims by secondary subcontractors. It achieves this balance by creating a federal cause of action, while mandating timely notice as a condition precedent to that cause of action. Notice to the prime contractor and surety is at the core of the scheme established by Congress under the Act and cannot, therefore, be ignored during the calcula-

tion of damages. *But see Lochridge–Priest,* 950 F.2d at 288–89. In determining prejudgment interest under the Miller Act, federal courts turn to state law for guidance and as a matter of convenience. Their findings are not, however, dictated by state law. Such a result would be inconsistent with both the intent of Congress and the spirit of the Court's holding in *F.D. Rich Co. v. United States,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974).

Accordingly, the court finds that the appropriate date for calculating prejudgment interest is thirty days after Balf made a claim on the bond, i.e. September 3, 1993.[16]

### 3. Attorneys' Fees

▪ Balf also contends that it is entitled to recover attorneys' fees because Defendants' have acted in an oppressive manner. FPTO, at 21–22. The court does not agree.

According to the "American Rule" in courts in the United States "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). *See Hall v. Cole,* 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1945–46, 36 L.Ed.2d 702 (1973). In *F.D. Rich,* the Supreme Court concluded that attorneys' fees are not available under the Miller Act. 417 U.S. at 127, 94 S.Ct. at 2164. In dicta, the Court did, however, suggest that fees might be awarded when the opposing party "acted in bad faith, wantonly, or for oppressive reasons." *Id.* at 129, 94 S.Ct. at 2165. *See Oliveri v. Thompson,* 803 F.2d 1265, 1272 (2d Cir.1986), *cert. denied sub nom., County of Suffolk v. Graseck,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

▪ Bad faith may be found not only in the actions that led to the lawsuit but also in the conduct of the litigation. *Oliveri,* 803 F.2d at 1272. Under Second Circuit law, an action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons. *Hirschfeld v. Board of Elections,* 984 F.2d 35, 40 (2d Cir.1993).

As previously discussed, satisfaction of the notice requirement is a condition precedent to maintaining a Miller Act case. *Fleisher,* 311 U.S. at 18–19, 61 S.Ct. at 83; *H.I. Lewis,* 375 F.2d at 198. The legal and factual questions within the instant case are far from simple. *See United States ex rel. Ga. Elec. Supply Co. v. United States Fidelity & Guar. Co.,* 656 F.2d 993, 996 (5th Cir. Unit B 1981) (Roney, J.) (describing the law surrounding the Miller Act as "admittedly hazy"). Defendants' conduct in the litigation of the instant matter has been at a minimum reasonable. Neither an honest dispute regarding the existence of a legal obligation nor the good faith defense of a lawsuit can provide a basis for the award of attorneys' fees. Defendants' conduct amounted to no more than either of these.

Accordingly, the court finds that attorneys' fees are not warranted in the present case.

### C. CUTPA

▪ Section 42–110b(a) of CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether a practice or act violates CUTPA, Connecticut courts examine the following three criteria:

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;

(2) whether it is immoral, unethical, oppressive, or unscrupulous; and

(3) whether it causes substantial injury to consumers, competitors or other businessmen.

*Murphy v. Provident Mut. Life Ins. Co.,* 923 F.2d 923, 929 (2d Cir.1990), *cert. denied,* 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991); *Web Press Servs. Corp. v. New London Motors, Inc.,* 203 Conn. 342, 525 A.2d 57, 64

---

**16.** Moreover, the court's determination is consistent with Conn.Gen.Stat. § 37–3a.

(1987). All three criteria need not be satisfied. *Cheshire Mortg. Serv., Inc. v. Montes,* 223 Conn. 80, 612 A.2d 1130, 1143–44 (1992). The substantial injury requirement involves a three-part analysis:

(1) it must be substantial;

(2) it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and

(3) it must be an injury that consumers themselves could not have reasonably avoided.

*Chem–Tek, Inc. v. General Motors Corp.,* 816 F.Supp. 123, 130 (D.Conn.1993) (Covello, J.); *Web Press Services Corp. v. New London Motors, Inc.,* 205 Conn. 479, 533 A.2d 1211, 1213–14 (1987) (Covello, J.).

### D. Count II—The CUTPA Claim

 Balf argues that "Casle and American have engaged in a violation of [CUTPA] by virtue of their violation of the Miller Act and the public policies embodied therein." FPTO at 19. The court does not agree.

In the instant case, Balf maintains that Casle's refusal to pay Balf, even after Casle received payment from the USPS, amounted to the oppressive conduct necessary to support a CUTPA claim. Balf's argument is misplaced. The good faith litigation of a disputed and complex issue does not constitute oppression under CUTPA.

As previously noted, the Miller Act provides protection for both secondary subcontractors and general contractors. The Act strikes a balance between the interests of both groups. If certain conditions precedent are met the contractor will be made liable; by the same token the contractor is entitled to rely on the statute for protection against tardy claims. *United States ex rel. John D. Ahern Co. v. J.F. White Contracting Co.,* 649 F.2d 29, 31 (1st Cir.1981). In the case at bar, Balf has not established by a preponderance of the evidence that Casle's conducted was in any way immoral, unethical, oppressive, or unscrupulous. Further, to punish Casle and American for invoking the protection afforded them under the Miller Act would be inconsistent with the intent of Congress. *See Tacon Mechanical Contractors, Inc. v. Aetna Casualty & Surety Co.,* 860

F.Supp. 385, 387–88 (S.D.Tex.1994); *United States ex rel. Pensacola Constr. Co. v. St. Paul Fire & Marine Ins. Co.,* 710 F.Supp. 638, 640 (W.D.La.1989).

Accordingly, judgment shall be entered in favor of the Defendants on the CUTPA claim.

### CONCLUSION

For the foregoing reasons, the Clerk of the court is DIRECTED to enter JUDGMENT in favor of Plaintiff on its Miller Act claim and for Defendants on the CUTPA claim.